2023 PA Super 119

| | | |
|---|---|---|
| RIVERVIEW CARPET & FLOORING, INC., A PENNSYLVANIA CORPORATION, MASCO INTERIORS, INC., A PENNSYLVANIA CORPORATION, ROLAND PASTUCHA ELECTRIC, INC., A PENNSYLVANIA CORPORATION, AND JERRY TIGANO, AN ADULT INDIVIDUAL, D/B/A TIGANO PAINTING AND WALLCOVERING. | : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br>No. 670 WDA 2021 |
| v. | : : : : | |
| PRESBYTERIAN SENIORCARE, A PENNSYLVANIA NON-PROFIT CORPORATION, LONGWOOD AT OAKMONT, INC., A PENNSYLVANIA NON-PROFIT CORPORATION, RICHARD G. AUFMAN, AN ADULT INDIVIDUAL TRADING AND DOING BUSINESS AS Z.G. HUNLEY CORP., ZADOK GRAHM HUNLEY CORP., A PENNSYLVANIA CORPORATION TRADING AND DOING BUSINESS AS Z.G. HUNLEY CORP., SODEXO OPERATIONS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AND JOHN R. MCCOLLUM, AN ADULT INDIVIDUAL | : : : : : : : : : : : : : : : : : : | |
| APPEAL OF: ZADOK GRAHM HUNLEY | : | |

Appeal From the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD 18-012048

| | | |
|---|---|---|
| RIVERVIEW CARPET & FLOORING, INC., A PENNSYLVANIA CORPORATION, MASCO INTERIORS, | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

INC., A PENNSYLVANIA
CORPORATION, ROLAND PASTUCHA
ELECTRIC, INC., A PENNSYLVANIA
CORPORATION, AND JERRY TIGANO,
AN ADULT INDIVIDUAL, D/B/A
TIGANO PAINTING AND
WALLCOVERING.

      v.

PRESBYTERIAN SENIORCARE, A
PENNSYLVANIA NON-PROFIT
CORPORATION, LONGWOOD AT
OAKMONT, INC., A PENNSYLVANIA
NON-PROFIT CORPORATION,
RICHARD G. AUFMAN, AN ADULT
INDIVIDUAL TRADING AND DOING
BUSINESS AS Z.G. HUNLEY CORP.,
ZADOK GRAHM HUNLEY CORP., A
PENNSYLVANIA CORPORATION
TRADING AND DOING BUSINESS AS
Z.G. HUNLEY CORP., SODEXO
OPERATIONS, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,  AND
JOHN R. MCCOLLUM, AN ADULT
INDIVIDUAL

:    No. 674 WDA 2021

APPEAL OF: RICHARD G. AUFMAN

Appeal From the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 18-012048

PRESBYTERIAN SENIORCARE AND
LONGWOOD AT OAKMONT, INC.

      v.

:    IN THE SUPERIOR COURT OF
:         PENNSYLVANIA

RICHARD G. AUFMAN, I/T/D/B/A          :
Z.G. HUNLEY CORP., ZADOK GRAHM        :    No. 676 WDA 2021
HUNLEY CORP.,I/T/D/B/A Z.G.           :
HUNLEY CORP., JOHN R. MCCOLLUM,       :
SODEXO OPERATIONS, LLC AND            :
JOSEPH SEPCIC, I/T/D/B/A Z.G.         :
HUNLEY CORP.                          :
                                      :
                                      :
APPEAL OF: SODEXO OPERATIONS,         :
LLC                                   :

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 15-015968

RIVERVIEW CARPET & FLOORING,          :    IN THE SUPERIOR COURT OF
INC., A PENNSYLVANIA                   :          PENNSYLVANIA
CORPORATION, MASCO INTERIORS,         :
INC., A PENNSYLVANIA                   :
CORPORATION, ROLAND PASTUCHA          :
ELECTRIC, INC., A PENNSYLVANIA         :
CORPORATION, AND JERRY TIGANO,        :
AN ADULT INDIVIDUAL, D/B/A            :
TIGANO PAINTING AND                   :    No. 677 WDA 2021
WALLCOVERING.                         :
                                      :
                                      :
           v.                         :
                                      :
                                      :
PRESBYTERIAN SENIORCARE, A            :
PENNSYLVANIA NON-PROFIT               :
CORPORATION, LONGWOOD AT              :
OAKMONT, INC., A PENNSYLVANIA          :
NON-PROFIT CORPORATION,               :
RICHARD G. AUFMAN, AN ADULT           :
INDIVIDUAL TRADING AND DOING          :
BUSINESS AS Z.G. HUNLEY CORP.,        :
ZADOK GRAHM HUNLEY CORP., A           :
PENNSYLVANIA CORPORATION              :
TRADING AND DOING BUSINESS AS         :
Z.G. HUNLEY CORP., SODEXO             :

- 3 -

OPERATIONS, LLC, A DELAWARE            :
LIMITED LIABILITY COMPANY,  AND        :
JOHN R. MCCOLLUM, AN ADULT             :
INDIVIDUAL                             :
                                       :
                                       :
                                       :
APPEAL OF: SODEXO OPERATIONS,          :
LLC                                    :

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 18-012048

RIVERVIEW CARPET & FLOORING,           :    IN THE SUPERIOR COURT OF
INC., A PENNSYLVANIA                    :          PENNSYLVANIA
CORPORATION, MASCO INTERIORS,          :
INC., A PENNSYLVANIA                    :
CORPORATION, ROLAND PASTUCHA           :
ELECTRIC, INC., A PENNSYLVANIA         :
CORPORATION, AND JERRY TIGANO,         :
AN ADULT INDIVIDUAL, D/B/A             :
TIGANO PAINTING AND                    :    No. 733 WDA 2021
WALLCOVERING.                          :
                                       :
                                       :
                                       :
              v.                       :
                                       :
                                       :
PRESBYTERIAN SENIORCARE, A             :
PENNSYLVANIA NON-PROFIT                :
CORPORATION, LONGWOOD AT               :
OAKMONT, INC., A PENNSYLVANIA          :
NON-PROFIT CORPORATION,                :
RICHARD G. AUFMAN, AN ADULT            :
INDIVIDUAL TRADING AND DOING           :
BUSINESS AS Z.G. HUNLEY CORP.,         :
ZADOK GRAHM HUNLEY CORP., A            :
PENNSYLVANIA CORPORATION               :
TRADING AND DOING BUSINESS AS          :
Z.G. HUNLEY CORP., SODEXO              :
OPERATIONS, LLC, A DELAWARE            :
LIMITED LIABILITY COMPANY,  AND        :
JOHN R. MCCOLLUM, AN ADULT             :
INDIVIDUAL                             :

- 4 -

J-A29002-22, J-A29006-22, J-A29008-22, J-A29009-22 & J-A29010-22

|  |  |
|---|---|
| | : |
| | : |
| | : |
| APPEAL OF: LONGWOOD AT | : |
| OAKMONT, INC. | : |

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-18-012048

BEFORE:  BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

OPINION BY BENDER, P.J.E.:                                  **FILED: July 10, 2023**

Sodexo Operations, LLC ("Sodexo"), Richard G. Aufman, and Zadok Grahm Hunley ("Hunley") each appeal — at docket numbers 677 WDA 2021, 674 WDA 2021, and 670 WDA 2021, respectively — from the trial court's May 11, 2021 judgment entered at GD 18-012048 following a non-jury trial.[1] Longwood at Oakmont, Inc. ("Longwood") cross-appeals at docket number 733 WDA 2021 from this same judgment.  In addition, Sodexo appeals at docket number 676 WDA 2021 from a separate May 11, 2021 judgment entered at GD 15-015968.[2]  Upon review, we affirm in part and reverse in part the judgment entered at GD 18-012048, and we affirm the judgment entered at GD 15-015968.

**Background**

---

[1] We note that the spelling of Hunley varies throughout the record between 'Hunley' and 'Hunly'.  We use the spelling that is used in the caption of its appeal in this writing, *i.e.*, 'Hunley'.

[2] We have consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513. **See** Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

The trial court summarized the background of this matter as follows:

**I. The Parties**

Presbyterian SeniorCare ("PSC") is a Pennsylvania not-for-profit corporation that provides continuum senior living and care services in fifty-three (53) separate housing communities. Longwood … is one of PSC's retirement communities.

[Sodexo] is a multi-national, interdisciplinary service provider. Sodexo offers food and senior living services including facilities management. Sodexo also has a construction division. PSC and Longwood engaged Sodexo to provide facilities management services at each of their respective campuses.

John McCollum ("McCollum") is an individual who spent most of his career running his own construction company, W.F. Cody. He was an employee of Sodexo during all times material to this litigation. Sodexo assigned McCollum to perform its obligations at both PSC and Longwood.

[Aufman] is a self-employed CPA. He is also a shareholder in several corporations, and a friend and business associate of McCollum.

Joseph Sepcic ("Sepcic") is an architect. He is also a friend and business associate of McCollum.

[Hunley] is a company, which Aufman incorporated on March 15, 2014, at the instruction of McCollum. Aufman owns twenty (20) percent of Hunley's shares. Sepcic owns the remaining shares. Aufman operated Hunley out of his home[-]office accounting practice.

Riverview Carpet & Flooring, Inc., Masco Interiors, Inc., Roland Pastucha Electric, Inc.,[3] and Tigano Painting and Wallcovering (collectively referred to hereinafter as the "Subcontractors") are all Pennsylvania Subcontractors. McCollum engaged the Subcontractors on behalf of Hunley to perform construction and finishing work on Longwood's campus.

---

[3] The captions referred to 'Roland Pastucha Electric, Inc.,' as 'Roland Patacha Electric, Inc.' We have amended them accordingly.

**II. Factual and Procedural Background**

On December 21, 2011, Sodexo and Longwood entered into a Facilities Management Agreement ("Longwood Management Agreement") with a term beginning January 16, 2012[,] and ending January 16, 2015. The Longwood Management Agreement required Sodexo to provide Longwood with a qualified General Manager to function as the head of Longwood's maintenance department. Thereafter, on May 24, 2012, Sodexo and PSC entered into a Facilities Management Agreement ("PSC Management Agreement") with a term beginning July 10, 2012[,] and ending July 10, 2015. From 2012 to 2014, Sodexo provided Longwood with a succession of on-site managers who did not adequately fulfill their roles and were repeatedly replaced by Sodexo. Meanwhile, McCollum and Sepcic discussed forming a construction company together. During these discussions[,] McCollum recommended that Sepcic contact Aufman.

In January of 2014, while the General Manager position at Longwood was vacant, Sodexo assigned McCollum to assist Longwood with a water pipe emergency. McCollum approached Aufman and Sepcic[,] and asked them whether they were interested in performing some work for PSC. Although, at this time, Hunley had not yet been incorporated, McCollum recommended Hunley to Longwood as a potential general contractor. McCollum told Longwood that he was personally familiar with Hunley, and that Hunley came highly recommended by others. Hunley then submitted bids, which Longwood accepted as a result of McCollum's recommendations. Once the water pipes were fixed, Longwood asked Sodexo to retain McCollum at the Longwood campus. Sodexo agreed, hoping that McCollum would become indispensable to Longwood, and remedy Sodexo's deficient performance in relation to the Longwood Management Agreement.

In March of 2014, Paul Peterson ("Peterson"), Longwood's new executive director, recognizing an urgent need for renovations, opted to establish a benchmark pricing structure for new unit turnovers instead of obtaining multiple bids for each unit. Peterson tasked McCollum with obtaining estimates based on work done in the past. McCollum represented that Hunley['s] estimates were lower than Bill Bonura Cabinets' estimates.[1] Peterson accepted McCollum's representations of the estimates, and the benchmarks were set accordingly.

[1] Bill Bonura Cabinets is a contractor Longwood engaged in the past.

McCollum had a significant role in Longwood's renovations. McCollum was responsible for gathering information on both the scope of work and the pricing for each unit renovation. Additionally, McCollum was tasked with overseeing the construction work. After a project was complete, McCollum obtained the general contractor's invoices and was responsible for submitting these invoices to Longwood's Accounts Payable Department. Even though Hunley submitted bids as a general contractor, Hunley did no actual work itself. Instead, McCollum engaged subcontractors and monitored the subcontractors['] work. Hunley had no employees or expenses.

In May of 2014, Aufman and his wife incorporated a company called Iron Bull Interiors, LLC. During this time, McCollum's performance at Longwood appeared to be satisfactory. McCollum quickly established himself as an integral part of the unit turnover process. Accordingly, Peterson deferred to McCollum, as Peterson trusted McCollum's construction experience, and McCollum's control of the invoice and capital approval process increased.

After September of 2014, McCollum's submission of invoices became increasingly sporadic. McCollum began withholding invoices for long periods of time, which made it difficult for Longwood to track costs on an ongoing basis. McCollum's practices also impacted Longwood's cashflow. Eventually, for the first time in 20 years, Longwood had to seek additional capital from its Board of Directors. This made it extremely difficult for Longwood to verify whether the invoices fell below or above Longwood's benchmarks. At the same time, Hunley hired McCollum's son Grahm, as an intern. Hunley listed Grahm as the Vice President on the company's signature card at First National Bank. Hunley also gave Grahm check writing authority on behalf of Hunley.

In October of 2014, several of [Longwood's] executives received an anonymous letter, which accused McCollum of having an improper interest in Hunley. This letter raised questions regarding Longwood's process for retaining contractors. Longwood confronted and interviewed McCollum in person about the allegations, which McCollum denied. Longwood also directed McCollum to respond to the allegations in writing, which McCollum did. Longwood thereafter asked McCollum to fill out and sign

Longwood's conflict[-]of[-]interest statement. McCollum completed and signed Longwood's conflict[-]of[-]interest statement and represented that he had no conflicts of interest. Longwood also asked Aufman if McCollum had any interest in Hunley. Aufman denied that McCollum had any interest whatsoever. After Longwood concluded its investigation, Longwood provided Sodexo with all … the aforementioned information so that Sodexo could conduct its own review and investigation of the matter. Based upon Longwood's investigation, and McCollum's and Aufman's assurances, Longwood's suspicions were mitigated, and Longwood took no further action.

In December of 2014, Longwood discovered a large number of delinquent Hunley invoices and thereafter informed Sodexo of McCollum's problematic invoice practices. A few Sodexo executives expressed their distrust of McCollum via internal correspondences. However, Sodexo's executives never shared their opinion of McCollum with Longwood. Meanwhile, Aufman formed Fairbanks Holding Co., Inc., for McCollum, and Grahm took ownership of Iron Bull, LLC, which was originally formed by Aufman and Aufman's wife. On December 9, 2014, Grahm opened a bank account for Iron Bull, LLC. On the same day, McCollum opened a bank account for Fairbanks Holding Co., Inc.[] The authorized signatories for Fairbanks Holding Co., Inc., include McCollum (as president), McCollum's wife, Regina (as secretary), and Grahm (as vice president).

In January of 2015, the Longwood Management Agreement was set to automatically renew. However, Longwood sent written notice to Sodexo that Longwood was opting out of the automatic renewal and terminating the Longwood Management Agreement. Nevertheless, because the PSC Management Agreement was not set to expire until July of 2015, Longwood decided that it preferred to end all relationships with Sodexo at the same time as PSC. Although Sodexo offered Longwood an agreement with an expanded scope, Longwood declined. Longwood instead purs[u]ed a limited extension of the Longwood Management Agreement and began negotiations with Sodexo for the same. On January 16, 2015, Longwood and Sodexo entered into a consulting agreement ("Longwood Consulting Agreement"). The Longwood Consulting Agreement provided that Sodexo would continue providing services at the Longwood campus until the end of June[] 2015. McCollum continued to manage and oversee Longwood's

renovations, and Sodexo continued to provide oversight and supervision over McCollum's work at Longwood.

By March of 2015, McCollum began shredding excessively large quantities of paper. McCollum discarded the shredded paper in various trash cans around Longwood's campus. In total, McCollum's shredded paper filled about five full trash cans per day. Meanwhile, Grahm systematically wrote checks on behalf of Hunley to Iron Bull, LLC[,] totaling $975,000.00. Grahm then wrote checks from Iron Bull, LLC to Fairbank[s] Holding Co., Inc., totaling $868,000.00. Of the funds transferred via check from Iron Bull, LLC to Fairbanks Holding Co., Inc., $111,989.50 went to Grahm personally. Grahm also wrote a check totaling $33,000.00 directly to himself. Iron Bull, LLC transferred another $10,000.00 to W.F. Cody.

On April 16, 2015, McCollum had a verbal altercation with a Longwood employee. Thereafter, on May 1, 2015, Longwood hired John Bulger ("Bulger") as a Facilities Director. Although McCollum was originally supposed to help Bulger transition into his new role, due to McCollum's verbal altercation with a Longwood employee, Longwood asked Sodexo to remove McCollum from Longwood's campus. On his own, Bulger attempted to understand where Longwood's renovations projects stood in terms of cost and completion status. However, Bulger's mission was frustrated because Bulger could not find adequate records. Additionally, there remained a large number of Hunley invoices, which Hunley claimed were overdue.

On May 22, 2015, Bulger convened a meeting with Aufman and several disgruntled Subcontractors whom Hunley had not paid. The end result of the meeting was that Aufman agreed to provide Bulger with additional information so that Bulger could verify Hunley's invoices. However, Aufman later refused to provide the additional documentation and continued to demand payment. While searching for Hunley's invoices, Longwood discovered numerous invoices that McCollum had not submitted during his tenure at Longwood. Some of these invoices were 18[-]months old.

While the Subcontractors complained that they were not being paid, Hunley refused to pay them until Longwood paid Hunley. Longwood needed to avoid delays in the renovation process so that Longwood's apartments were ready in time for new occupants. Accordingly, while Bulger's investigation of the Hunley

invoices remained ongoing, Longwood began issuing large checks to Hunley in reliance upon Hunley's promise to pay the Subcontractors within seven (7) to ten (10) days. Nevertheless, despite receiving $613,069.50 from Longwood after McCollum left, Hunley did not pay the Subcontractors and continued to demand more money from Longwood. In order to keep the renovation projects moving along, Bulger assured the Subcontractors that Longwood would "make good on Hunley's debt." Based upon Bulger's assurance, the Subcontractors continued working.

Bulger began to suspect that Hunley severely overcharged Longwood, as Bulger discovered that he could perform the role of the general contractor himself without need for an outside general contractor like Hunley. While Hunley threatened Longwood with litigation, Longwood retained counsel and withheld any more payments to Hunley for Hunley's allegedly outstanding invoices. Eventually, on September 14, 2015, PSC and Longwood initiated the instant action. Through discovery, PSC and Longwood discovered the extent of McCollum and Hunley's relationship, in addition to the extent of McCollum's and Hunley's overcharges and fraud.

PSC and Longwood's original complaint was docketed at GD 15-015968. On March 20, 2017, PSC and Longwood[] filed their First Amended Complaint. PSC and Longwood's First Amended Complaint is their final operative complaint. PSC and Longwood's final operative complaint alleged five counts. Counts I is for Breach of Contract, and it alleges that Sodexo breached both the Longwood Management Agreement and the PSC Management Agreement. Count II is for Breach of Contract with a Demand for Indemnification. Count II alleges that Sodexo breached the indemnification clauses of both the Longwood Management Agreement and the PSC Management Agreement. Count III is for Unjust Enrichment, and it alleges that Hunley received inequitably high sums of money in relation to the actual work that Hunley performed. Count IV is for Fraud, and it alleges that Hunley, Aufman, Sepcic, and McCollum were overpaid for their services as a result of fraudulent misrepresentations. Finally, Count V is for Conspiracy, and it alleges that Hunley, Aufman, Specic [sic], McCollum, and Sodexo conspired to defraud both PSC and Longwood.

On June 28, 2017, following PSC and Longwood's First Amended Complaint, Sodexo filed its final operative counterclaims to its

Answer, New Matter, and Counterclaims to First Amended Complaint. In total, Sodexo asserted four counterclaims. Counterclaim I is for Breach of Contract, and it alleges that Longwood breached the Longwood Management Agreement by failing to pay software licensing fees. Counterclaim II is for Unjust Enrichment, and it alleges that Longwood was unjustly enriched because Longwood was able to use Sodexo's software without paying the requisite fees. Counterclaim III is for Breach of Contract, and it alleges th[at] PSC breach[ed] the PSC Management Agreement for failing to pay software licensing fees. Finally, Counterclaim IV is for Unjust Enrichment, and it alleges that PSC was unjustly enriched because PSC was able to use Sodexo's software without paying the requisite fees.

On January 23, 2017, Hunley filed a complaint against PSC and Longwood at GD 17-00195. On March 16, 2017, this [c]ourt consolidated Hunley's claims at GD 17-001195 with the action at GD 15-015968. On October 3, 2017, Hunley filed its Second Amended Complaint, which [is] its final operative complaint. Hunley's final operative complaint alleged three [c]ounts. Count I is for Breach of Contract, and it alleges that … PSC and Longwood breached various written and oral contracts with Hunley because PSC and Longwood failed to pay Hunley for outstanding invoices for Hunley's services as a general contractor. Count II is for Unjust Enrichment, and it alleges that PSC and Longwood were unjustly enriched because they received the benefit of the Subcontractors' work without paying Hunley's outstanding invoices. Count III alleges that PSC and Longwood are liable to Hunley pursuant to the Pennsylvania Contractor and Subcontractor Payment Act for failing to pay Hunley's outstanding invoices.

On September 7, 2018, the Subcontractors filed a Complaint against all the above-mentioned parties at GD 18-012048. Each of the four Subcontractors alleged a separate count for Breach of Contract against all parties for failing to pay the invoices of the Subcontractors. Additionally, each of the four Subcontractors alleged a separate count for Conspiracy to Commit Fraud against Sodexo, McCollum, Aufman, and Hunley. On November 28, 2018, this Court consolidated the Subcontractors' claims at GD 18-012048 with the actions at GD 17-001195 and GD 15-015968. On February 7, 2019, the Subcontractors filed their Amended Complaint, which is the Subcontractors' final operative complaint. The Subcontractors' final operative complaint remains unchanged with regards to the counts for breach of contract. However, the

- 12 -

Subcontractors' final operative complaint substituted the four counts for Conspiracy to Commit Fraud with four counts of Unjust Enrichment against PSC and Longwood. All of the counts for Unjust Enrichment allege that both PSC and Longwood were unjustly enrich[ed] because PSC and Longwood failed to provide compensation to the Subcontractors in relation to completed construction work.

On February 21, 2019, PSC and Longwood filed a crossclaim[,] attempting to shift liability for the Subcontractors' claims to Sodexo, McCollum, Hunley, Aufman, and Sepcic. Then, on February 27, 2019, Hunley filed its own crossclaim[,] attempting to shift liability for the Subcontractors' claims to PSC and Longwood.

In [March] of 2019, this [c]ourt held a non-jury trial[,] in which all the parties had a full and adequate opportunity to present their respective cases. On April 9, 2020, this [c]ourt issued a Memorandum and Non-Jury Verdict. Shortly thereafter, on April 14, 2020, this [c]ourt issued an Amended Memorandum and Non-Jury Verdict (dated April 9, 2020), which detailed the verdicts described below.

With regard to PSC and Longwood's affirmative claims in their First Amended Complaint at GD 15-015968, this [c]ourt held: (1) in favor of PSC and Longwood and against Sodexo on Count [I] (Breach of Contract); (2) in favor of Sodexo and against PSC and Longwood on Count II (Demand for Indemnification); (3) in favor of Hunley, Aufman, and Sepcic and against PSC and Longwood on Count III (Unjust Enrichment); and (4) in favor of PSC and Longwood and against Hunley, Aufman, Sepcic, Sodexo, and McCollum on Count IV (Fraud) and Count V (Conspiracy). [For these claims, the trial court determined that Longwood is entitled to $933,220.71 from all defendants, jointly and severally.]

With regard to Sodexo's counterclaims against PSC and Longwood at GD 15-015968, this [c]ourt held: (1) in favor of Sodexo and against Longwood on Sodexo's Counterclaim I (Breach of Contract) in the amount of $4,409.65; (2) in favor of Longwood and against Sodexo on Sodexo's Counterclaim II (Unjust Enrichment); (3) in favor of Sodexo and against PSC on Sodexo's Counterclaim III (Breach of Contract) in the amount of $31,666.47; and (4) in favor of PSC and against Sodexo on Sodexo's Counterclaim IV (Unjust Enrichment).

- 13 -

With regard to Hunley's affirmative claims against PSC and Longwood at GD 17-001195, this [c]ourt held: (1) in favor of PSC and Longwood and against Hunley on Count I (Breach of Contract for Unpaid Invoices)[;] (2) in favor of PSC and Longwood and against Hunley on Count II (Unjust Enrichment for Unpaid Invoices); and (3) in favor of PSC and Longwood and against Hunley on Count III (Violation of the Pennsylvania Contractor and Subcontractor Payment Act).

With regard to the Subcontractors' claims against PSC and Longwood at GD 18-012048,[4] this [c]ourt held: (1) in favor of Riverview Carpet & Flooring, Inc., and against Longwood on Count I (Breach of Contract) in the amount of $82,571.97; (2) in favor of Masco Interiors, Inc., and against Longwood on Count II (Breach of Contract) in the amount of $218,135.00; (3) in favor of Roland Pastucha Electric, Inc., and against Longwood on Count III (Breach of Contract) in the amount of $32,245.00; [(4)] in favor of Tigano Painting and Wallcovering and against Longwood on Count IV (Breach of Contract) in the amount of $86,597.00;[5, 6] [(5)] in favor of Longwood and against the Subcontractors on Counts V-VIII (Unjust Enrichment); [(6)] in favor of Longwood and against Hunley, Aufman, Sepcic, McCollum, and Sodexo on Longwood's Crossclaim;[2] and [(7)] in favor of Longwood and against Hunley on Hunley's Crossclaim.

> [2] This [c]ourt ordered Hunley, Aufman, [and] Sepcic[] to contribute to the sums that [the] Subcontractors shall collect from Longwood by virtue of this verdict.

---

[4] At trial, the Subcontractors represented that they had withdrawn their breach-of-contract claims against all parties except for Hunley and Longwood. *See* N.T. Trial, 3/13/19, at 1747-48. As discussed *infra*, the trial court later amended its verdict to include Hunley, Aufman, Sepcic, and McCollum as parties against whom each Subcontractor was awarded damages for breach of contract.

[5] In finding that Longwood breached its contracts with the Subcontractors, the trial court determined that Bulger's "promises to the Subcontractors constitute an enforceable contract of guaranty by Longwood to guarantee paying the invoices which Hunley owed to the Subcontractors." Trial Court Memorandum and Non-Jury Verdict ("TCMNV"), 4/14/20, at 24.

[6] The total amount due to the Subcontractors is $419,548.97.

Following this [c]ourt's April 14, 2020[] Amended Memorandum and Non-Jury Verdict, the parties filed Motions for Post-Trial Relief. On September 29, 2020, after hearing oral argument, and after due considerations of the parties' briefs, this [c]ourt issued an order addressing the parties' Motions for Post-Trial Relief. This [c]ourt's September 29, 2020 order denied Sodexo's, Hunley's, McCollum's, Aufman's, and Sepcic's Motions for Post-Trial Relief. This [c]ourt's September 29, 2020 order also denied PSC's and Longwood's Motion for Post-Trial Relief, at least to the extent that PSC and Longwood requested an additional award for punitive damages, and a stay of execution pursuant to Pa.R.C[iv].P. 3121. This [c]ourt's September 29, 2020 order, nonetheless, granted PSC and Longwood's Motion for Post-Trial Relief to the extent that PSC requested that the April 14, 2020 Amended Non-Jury Verdict be amended further to reflect this [c]ourt's decision as explained in this [c]ourt's April 14, 2020 Amended Memorandum. Accordingly, Sections 4(a)-(d) of this [c]ourt's Amended Non-Jury Verdict[,] dated April 14, 2020[,] were amended to include Hunley, Aufman, Sepcic, and McCollum as parties against whom each Subcontractor was awarded damages [for breach of contract]. Section 4(f) of this [c]ourt's Amended Non-Jury Verdict[,] dated April 14, 2020[,] was also amended to read: "In favor of Longwood and against Hunley, Aufman, Sepcic, McCollum, and Sodexo on Longwood's Crossclaim. Hunley, Aufman, Sepcic, McCollum, and Sodexo shall, jointly and severally, indemnify Longwood for all amounts [Longwood] pays or are otherwise collected from [Longwood] by the Subcontractors pursuant to this Verdict."

On May 7, 2020, the Subcontractors also filed a Motion to Mold the Verdict to include pre-judgment and post-judgment interest. The Subcontractors' Motion to Mold the Verdict was heard at the same time as the other parties' Motions for Post-Trial Relief. In a separate order dated September 29, 2020, but filed on October 1, 2020 (the "October 1, 2020 order"), this [c]ourt granted the Subcontractor's Motion to Mold the Verdict. Accordingly, this [c]ourt's October 1, 2020 order molded the above[-]mentioned verdicts awarded in favor of the Subcontractors to include pre-judgment and post-judgment interest. Specifically, the final amounts of the verdicts awarded in favor of the Subcontractors were molded as follows: (1) in favor of Riverview Carpet & Flooring, Inc., and against Longwood, Hunley, Aufman, Sepcic, and McCollum on Count I (Breach of Contract) in the amount of $156,756.00; (2) in favor of Masco Interiors, Inc., and against

- 15 -

Longwood, Hunley, Aufman, Specic [*sic*], and McCollum on Count II (Breach of Contract) in the amount of $287,477.04; and (3) in favor of Tigano Painting and Wallcovering and against Longwood, Hunley, Aufman, Sepcic, and McCollum on Count IV (Breach of Contract) in the amount of $114,531.95.

On February 2, 2021, after reviewing Longwood's and PSC's Petition for Award of Attorney[s'] Fees and Litigation Expenses Including Pre-Hearing Statement, and after a hearing on the same, this [c]ourt issued an order granting Longwood and PSC attorney[s'] fees and expenses totaling $1,062,053.67.

Trial Court Opinion ("TCO I"), 4/19/22, at 1-13 (some original brackets changed to parentheses; some brackets added; spelling of Hunley modified).

On May 11, 2021, the trial court entered separate judgments on each trial court docket (*i.e.*, GD 15-015968, GD 17-001195, GD 18-012048).[7] Each separate judgment contained only the trial court docket number at which the judgment was filed and related only to the claims associated with that particular docket number.

Sodexo, Aufman, and Hunley each filed a timely notice of appeal from the judgment entered at trial court docket GD 18-012048.[8, 9] Longwood also

---

[7] Some of the parties involved in this matter had prematurely filed appeals without judgment being entered. This Court quashed those appeals, directing the parties to appeal after the trial court entered separate judgments at each trial court docket. **See** Trial Court Judgment at GD 15-015968, 5/11/21, at Exhibit A; Trial Court Judgment at GD 18-012048, 5/11/21, at Exhibit A.

[8] In addition to the appeals addressed in this writing, there are multiple other appeals related to this matter before our Court at docket numbers 671 WDA 2021, 672 WDA 2021, 673 WDA 2021, and 675 WDA 2021.

[9] In the captions of these notices of appeal, only the trial court docket number GD 18-012048 was listed.

subsequently filed a timely cross-appeal at this docket.[10, 11]  In addition, Sodexo filed a timely notice of appeal from the judgment entered at trial court docket GD 15-015968.[12]  The trial court directed each of them to file a Pa.R.A.P. 1925(b) concise statement for their respective appeals, and they all timely complied.  The trial court thereafter issued opinions pursuant to Rule 1925(a).[13]

### Longwood's Appeal at 733 WDA 2021

We commence our review with Longwood's appeal at 733 WDA 2021. There, Longwood presents the following questions for our consideration:

> 1. Whether Longwood … is liable to [the Subcontractors] for unpaid invoices directed to [Hunley] by virtue of a purported contract of guaranty, where such guaranty was oral, not supported by adequate consideration, and the essential terms of which were not defined.

---

[10] Longwood also only listed trial court docket number GD 18-012048 in its notice of appeal.

[11] **See** Pa.R.A.P. 903(b) ("[I]f a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was served, or within the time otherwise prescribed by this rule, whichever period last expires.").

[12] Therein, Sodexo only listed trial court docket number GD 15-015968.

[13] The trial court's Rule 1925(a) opinions do not respond to all the issues raised by the parties in their Rule 1925(b) concise statements.  Nevertheless, our review is not hampered, and a remand for the preparation of additional Rule 1925(a) opinions is not warranted.  **See Commonwealth v. Widger**, 237 A.3d 1151, 1158 n.5 (Pa. Super. 2020) ("Although we do not approve of or sanction the trial court's failure to comply with its obligations under Rule 1925(a), the lack of a Rule 1925(a) opinion does not preclude this Court's review of the merits of [the a]ppellant's issues based upon our review of the record, including the notes of testimony from [the a]ppellant's trial.").

2. Whether Longwood is liable to the Subcontractors for pre-judgment interest (excluding Roland Pastucha Electric, Inc., which did not assert a claim for pre-judgment interest) when:

(a) the Subcontractors' oral contracts were with, and their invoices were directed to, Hunley and not Longwood; and

(b) the total amount due by Hunley on the Subcontractors' invoices was unknown to Longwood at the time of Longwood's purported guaranty; and

(c) the equities did not support an imposition of pre-judgment interest against Longwood.

3. Whether Longwood was entitled to a stay of payment of the judgment entered against Longwood and in favor of the Subcontractors, when:

(a) Pa.R.Civ.P. 3121(b)(2) permits a trial court to stay execution against a judgment debtor when justice so requires, as it did in this case;

(b) Longwood's liability to the Subcontractors was found to be based upon a guaranty, and a guarantor's payment obligation is only triggered upon default by the principal debtor; and

(c) Hunley, … Aufman …, and … Sepcic … are principally liable for the underlying debt owed to the Subcontractors.

Longwood's Brief at 733 WDA 2021 ("Longwood Brief I") at 6-7.

## Longwood's First Issue

In Longwood's first issue, it argues that its purported oral guaranty to pay Hunley's debt to the Subcontractors was not enforceable. First, it contends that oral guaranties are barred by the Statute of Frauds. Second, Longwood advances that there was no consideration for the purported guaranty, as it disputes that Bulger made a promise that Longwood would pay the Subcontractors if they agreed to keep working. It insists that "the Subcontractors cannot, and at trial did not, point to any statement or

representation from Bulger or any other person at Longwood promising payment of Hunley's [debt] in exchange for on-site work." *Id.* at 38. Third and finally, Longwood points out that "[a] critical aspect to the formation of any enforceable contract is a mutual understanding of all material terms[,]" and says that Bulger did not know the amount of Hunley's debt to the Subcontractors at the time he made the purported guaranty on behalf of Longwood. *Id.* at 39. In addition to Bulger's not knowing how much Hunley owed the Subcontractors, Longwood says the Subcontractors "presented no evidence at trial showing that they told Bulger how much they were owed by Hunley. And because of Aufman's refusal to provide documentation to back up Hunley's invoices…, the amount owed to the Subcontractors was not clear to the parties until the time of trial…." *Id.* at 40 (citation omitted).

To challenges to a non-jury verdict, we apply the following standard and scope of review:

> Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review[,] the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. Our scope of review regarding questions of law is plenary.

*Woullard v. Sanner Concrete and Supply*, 241 A.3d 1200, 1207 (Pa. Super. 2020) (citations omitted).

*Statute of Frauds*

We assess Longwood's Statute-of-Frauds argument to begin. In support of its claim that the Statute of Frauds bars oral guaranties, Longwood relies on 33 P.S. § 3, which provides:

> No action shall be brought whereby to charge any executor or administrator, upon any promise to answer damages out of his own estate, or whereby to charge the defendant, upon any special promise, to answer for the debt or default of another, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him authorized.

33 P.S. § 3.

> With respect to Section 3, this Court has explained:

> Promises to pay the debt of another must be in writing for at least two reasons. The first is *evidentiary*. The second, *cautionary*.

> > Like other provisions of the [S]tatute of [F]rauds, the suretyship provision serves an evidentiary function. Indeed, … the circumstance that 'the promisor has received no benefit from the transaction … may make perjury more likely, because while in the case of one who has received something the circumstances themselves which are capable of proof show probable liability, in the case of a guaranty nothing but the promise is of evidentiary value.' Furthermore, though in many instances the surety is paid by the principal for his undertaking, in others the surety's motivation is purely gratuitous and, 'as the lack of any benefit received by the guarantor increases the hardship of his being called upon to pay, it also increases the importance of being very sure that he is justly charged.'

> > In addition to its evidentiary role, the provision serves a cautionary function. By bringing home to the prospective surety the significance of his act, it guards against ill-considered action. Otherwise, he might lightly undertake the engagement, unwisely assuming that there is only a remote possibility that the principal will not perform his duty….

E.A. Farnsworth, *Contracts* § 6.3 (1982).

***Thomas A. Armbruster, Inc. v. Barron***, 491 A.2d 882, 883-84 (Pa. Super. 1985) (emphasis in original; original brackets omitted).

In response to Longwood's reliance on Section 3, the Subcontractors assert that an exception to the Statute of Frauds — specifically, the Leading Object Rule — applies here. Subcontractors' Brief at 11, 14-15. Under the Leading Object Rule, "[w]henever the main purpose and object of the promisor, is, not to answer for the debt of another, but to subserve some pecuniary or business purpose of his own … his promise is not within the [S]tatute of [F]rauds, although it may be in form a provision to pay the debt of another…." ***Thomas A. Armbruster, Inc.***, 491 A.2d at 884 (citations and original brackets omitted).[14] The reason for this exception is because:

---

[14] Longwood argues that the Subcontractors waived their Leading-Object-Rule argument because they raised it for the first time in their appellate brief. We disagree. To start with, "it is a well-settled doctrine in this Commonwealth that a trial court can be affirmed on any valid basis appearing of record." ***See In the Interest of T.P.***, 78 A.3d 1166, 1170 (Pa. Super. 2013) (citations omitted). "The precept may be applied even though the reason for sustaining the judgment was not raised in the trial court, relied on by that court in reaching its decision, or brought to the attention of the appellate courts." ***Id.*** (citation omitted).

Notwithstanding the foregoing, Longwood complains that the Subcontractors did not raise the Leading Object Rule in their amended complaint, reply to new matter, post-trial motion to mold the verdict, or in a concise statement of errors complained of on appeal. Setting aside that we can affirm on any basis, we are unconvinced that the Subcontractors had to raise the Leading Object Rule at these junctures below. Longwood's Reply Brief at 733 WDA 2021 ("Longwood's Reply Brief") at 4-5. Specifically, the Subcontractors did not have to file a concise statement of errors complained of on appeal because they did not file an appeal, and we do not see why (nor

*(Footnote Continued Next Page)*

Where the surety-promisor's main purpose is his own primary or business advantage, the gratuitous or sentimental element often present in suretyship is eliminated, the likelihood of disproportion in the values exchanged between promisor and promisee is reduced, and the commercial context commonly provides evidentiary safeguards. Thus[,] there is less need for cautionary or evidentiary formality than in other cases of suretyship.

*Id.* (citing Restatement (Second) of Contracts § 116, cmt. a).

The Subcontractors argue that the main purpose of Bulger's promise

was not to answer for the debts of Hunley, but instead to benefit the business

---

does Longwood explain why) the Subcontractors would have had to raise the Leading Object Rule in their amended complaint or post-trial motion to mold the verdict.

As for the Subcontractors' reply to new matter, we also would discern no issue. In the Subcontractors' complaint against all defendants, they alleged various breaches of oral and written contracts that pertained to projects at Longwood's campus. *See generally* Subcontractors' Amended Complaint, 2/7/19. In Longwood's new matter, it simply stated, without any further elaboration or specificity, that "Subcontractors' claims are barred by the [S]tatute of [F]rauds." *See* Longwood's Answer to Subcontractors' Amended Complaint with New Matter and Crossclaims, 2/21/19, at ¶ 73. Longwood did not specifically set forth Section 3, mention oral guarantees, or explain why or how the Statute of Frauds barred the Subcontractors' claims against all the defendants. In reply, the Subcontractors stated: "In response to Paragraph 73, said paragraph is a conclusion of law to which no response is required. Accordingly, said paragraph is deemed denied by operation of law. However, to the extent that an answer may be required, [Subcontractors'] claims are not barred by the [S]tatute of [F]rauds." Subcontractors' Reply to New Matter, 2/27/19, at ¶ 6. Given the general way in which Longwood raised the Statute of Frauds in its new matter, we deem the Subcontractors' reply a sufficient response. Further, based on our review of record, it appears that Longwood did not specifically raise Section 3 of the Statute of Frauds until *its own* appellate brief. Prior to that, it only generally argued in its post-trial motion, without supporting authority, that an oral guaranty was unenforceable. *See* Post-Trial Motion, 6/12/20, at 9 (asserting, without any elaboration, that "the oral statements of … Bulger to the Subcontractors purporting that Longwood 'would make good on Hunley's invoices' do not amount to an enforceable guaranty in that they were oral and not supported by adequate consideration").

interests of Longwood, as it ensured that the Subcontractors completed the work, allowing the units at Longwood to be sold or otherwise occupied. Subcontractors' Brief at 11. The Subcontractors say that "Longwood could not stop the work if it wanted to get the residents into the apartments in time." *Id.* at 13 (citation omitted). The trial court also recognized the losses that Longwood would incur if the Subcontractors' work did not continue, explaining:

> Bulger's statements that Longwood will "make good on Hunley's invoices" were not mere gratuities, but a binding contract of guaranty. Those statements[,] in conjunction with his promise during the May 22 meeting[,] show that Bulger's reassurances **were intended to persuade the Subcontractors to continue working on Longwood's projects.** This [c]ourt is persuaded that the Subcontractors had no faith that Hunley would pay them; Hunley persisted to default on its payments to the Subcontractors even after Longwood paid Hunley a significant payment on the promise that Hunley would pay the Subcontractors. **Bulger's promises were the only reason the Subcontractors continued working**….
>
> [T]he benefit that Longwood obtained for its promise to guarantee Hunley's debt constituted sufficient consideration. **If the Subcontractors had exercised their right to withhold performance on their contracts with Hunley, Longwood admittedly would have incurred significant losses.** Longwood had no means by which it could require the Subcontractors to work, as it had no direct contract with them. **Therefore, Bulger's promises that Longwood would make good on Hunley's debts were supported by sufficient consideration and constitute an enforceable contract of guaranty.**

TCMNV at 24-25 (emphasis added).[15]

---

[15] Based on our review of the record, the trial court did not specifically address the application of the Leading Object Rule to the matter at hand.

The record supports the trial court's factual findings. *See Woullard*, *supra*. To begin, the importance to Longwood's business of completing unit renovations in a timely manner was emphasized repeatedly throughout the trial. *See* N.T. Trial, 3/4/19, at 43 (PSC's Chief Executive Officer — Paul Winkler — stating: "So we have a period of time when a person moves out of an apartment, they move to a higher level of care and maybe because of death, that kind of thing, and in which we then are marketing that unit, and so that period of time is really important that it not become too prolonged"); *id.* (Winkler's conveying that, at the time Sodexo was hired, Longwood "was seeing … a significant increase in the number of units that were vacant and needed renovation or refurbishment"); *id.* at 91 (Winkler's agreeing that one of the key drivers is getting people into apartments as soon as possible so that they pay entrance fees and maintenance fees); *id.* at 118 (Winkler's sharing: "But first and foremost[,] our team closest to the work was most concerned about anything that could cause disruption with completing those units so that we could market them. … [T]here was a heightened urgency around that"); *id.* at 194 (Winkler's recounting that, in ending Longwood/PSC's relationship with Sodexo, "the biggest concern was we needed to get these unit renovations done"); N.T. Trial, 3/5/19, at 245-46 (James Pieffer, the Senior Vice President for PSC, explaining: "[T]he successful retirement communities really depend on strong occupancy and good expense quality and control. So[,] without having units ready to be marketed, shown, and sold to residents, we are at a strong disadvantage"); *id.* at 390 (Pieffer's

stating that "[o]ur marketing depends on having units available[,]" and agreeing that Longwood is not making money if no one is living there); *id.* at 427 (Senior Director at Longwood, Paul Peterson, relaying: "We had prospects, people interested in moving into the apartments, and we had committed to them about a deadline for the project being completed so that they could move in. They were trying to prepare and plan their life, and they were trying to sell their home so that they could move into that apartment[,] … so it was crucial that the timelines were being met"); N.T. Trial, 3/6/19, at 550 (Peterson's confirming that Longwood is not making money unless people are living in the units); *id.* at 629 (PSC's Chief Financial Officer's — Joseph Wenger — testifying: "Census and occupancy is the whole driver of Longwood at Oakmont's particular type of business. You have to keep the apartments occupied, and so census is a heightened issue, and certainly a lot of conversation around what was being occupied and what I will say inventory that was not renovated and could be sold [*sic*]").

In addition, John Bulger testified that, when he first took the position with PSC, he learned that Longwood was struggling with the unit-turnover process, and that "there was some trouble with getting the apartments renovated in time for the residents to move in." N.T. Trial, 3/11/19, at 48. Bulger further acknowledged that the fact that the Subcontractors were not getting paid was causing him a problem, and that they were starting to come to him for payment. *Id.* at 1359. *See also id.* at 1237-38 (Aufman's remembering that he received an email from Bulger on June 1, 2015, where

Bulger stated: "You have a very angry group of subs, some of which may refuse to work with us until they see some payments.").

Further, despite beginning to believe that Hunley's prices were higher than normal, Bulger did not stop Hunley's work due to his concern about having residents move into their apartments on time:

> [Sodexo's attorney:] [W]e saw an email earlier[, dated June 9, 2015,] with [Jim] Deller who was Hunley's superintendent, and you were talking about other things for him to keep going on; right?
>
> [Bulger:] They were projects in process, yes.
>
> [Sodexo's attorney:] Well, you could have stopped it; right?
>
> [Bulger:] Not if I wanted to get the residents into their apartment in time.
>
> [Sodexo's attorney:] So you were pressed?
>
> [Bulger:] Not pressed.  I work by deadlines.  It is a construction business.  That is what we do.
>
> [Sodexo's attorney:] But you could have stopped -- you are a construction guy.  You've got lots and lots of contacts?
>
> [Bulger:] I do.
>
> [Sodexo's attorney:] There are lots of subcontractors that work in that area that you have relationships with?
>
> [Bulger:] Absolutely.
>
> [Sodexo's attorney:] So you don't think you could have put a full stop to any work and brought in people in a matter of days to pick it up?
>
> [Bulger:] That is not a fair time to give someone the chance to give me a price to finish the project.  You should give them at least 7 to 10 days and go through the three[-]bid process.
>
> [Sodexo's attorney:] So between --

[Bulger:] It is a two to three-week process to bring in another contractor.

*Id.* at 1397-98.

Against this backdrop of time pressures, Bulger met with Aufman and the unpaid Subcontractors on May 22, 2015. *See* TCO I at 6. Regarding that meeting, Robert Swidorsky — an employee of Riverview Carpet & Flooring, Inc. — testified:

[Subcontractors' attorney:] What was the purpose of [the May 22] meeting?

[Swidorsky:] I think the purpose of the meeting[,] essentially[,] was for all of the subs that were involved in these projects that were ongoing[,] and some projects that were probably already completed that we hadn't been paid for, which is what caused the apprehension with us moving forward [*sic*]. If we hadn't been paid for the first, say, six or eight projects, we were kind of nervous about the next eight to fifteen projects we were in the middle of. If we didn't get paid for the first ones, we needed reassurance we were getting paid for the ones we were in the middle of, as well as the ones we hadn't been paid for yet.

[Subcontractors' attorney:] Did you receive any reassurances at that meeting?

[Swidorsky:] We did.

[Subcontractors' attorney:] What was told to you?

[Swidorsky:] It was essentially said that, you know, we need you guys to stick [it] out, get these jobs done, and Longwood owes Hunley more money than Hunley owes you guys[,] and that we would be sure that you got paid.

[Subcontractors' attorney:] Who made this statement?

[Mr. Swidorsky:] John Bulger.

[Subcontractors' attorney:] When he said that, who did you think he meant … was going to make sure you got paid?

[Swidorsky:] I think we all walked away from that meeting thinking[,] in one way or shape or form[,] that Longwood was not

- 27 -

going to hang us out to dry and [it would] make sure we were paid, whether it be with the[ir] withholding funds from Hunley to be sure we were paid, or they would pay us directly.

[Subcontractors' attorney:] I believe you stated that you were going to get paid for all … the outstanding invoices?

[Swidorsky:] Correct, as well as the ones we were in the midst of. We hadn't completed several projects, and that was our concern, … we needed assurance we were going to get paid if we continued to do the work.

[Subcontractors' attorney:] Do you know why he would have made a statement to you that you were going to get paid for all … your outstanding invoices?

[Swidorsky:] I would have to assume, but assuming that there were probably a couple meetings prior to that meeting with the group of us, that, you know, they understood what their commitments were to their residents and incoming residents, that they couldn't start that process over and fulfill their deadlines. My feeling was they wanted to give us the assurance we would be paid so they could stay on track with the work they needed completed.

[Subcontractors' attorney:] They wanted assurance from you that you were going to stay; is that correct?

[Swidorsky:] Right.

[Subcontractors' attorney:] What would happen if you walked off the job because you were not paid all … these outstanding invoices?

[Swidorsky:] I would have to speculate that they would have to start the process with new contractors that would come in the middle of those projects, and at the end of the day[,] that is just a tremendous amount of lost time. And you've got facilities tor[n] up due to floods and things of that nature. They didn't have time. They needed their facility to be put back together.

[Subcontractors' attorney:] Now, I want you to clarify something for us. You stated earlier that -- this might not be *verbatim* -- but that Mr. Bulger said money had been held back from Hunley to pay you?

[Swidorsky:] No. … [A]t the end of the projects that we were either not paid for yet or the projects that we were in the middle of, that those totals were more money than Hunley owed us for either the projects that were completed or the projects that we were in. Therefore, that was our assurance, that they would either withhold money from Hunley to pay us, or they would be sure we got paid. How exactly they were going to pay us[,] really[,] I can only speculate on. That was the impression -- based on the verbiage used, whether they withheld money or paid us [them]selves, the assurance was we would be paid.

[Subcontractors' attorney:] Either way you were led by Mr. Bulger [to believe] that you would be paid?

[Swidorsky:] Yes. At that point[,] it was adequate. An organization the size of [PSC], when there's an administrative assurance you will get paid for the work you do, in my mind that's enough.

N.T. Trial, 3/13/19, at 1766-69.

Bob Bierly of Riverview Carpet and Flooring, Inc., similarly testified that "Mr. Bulger assured us, don't worry, we will get paid, more money is owed than we are owed…. He did ask us to finish the projects that we were currently involved in that Hunley had assigned to us so that people could move in, or, you know, different things like that could happen." *Id.* at 1752. When asked if he thought of leaving the project because of the money owed, Bierly answered: "When [Bulger] assured us that we would get paid, it wasn't a problem. It was to the point where I was not able to carry much more. I couldn't expend any more money without receiving money." *Id.* at 1752-53. Bierly also relayed that Bulger "said if we didn't get paid by Hunley, that [Longwood] would take care of it because more money was owed, that they would be able to make the subs whole." *Id.* at 1753.

After the May 22, 2015 meeting, and after Hunley still had not paid the Subcontractors, Bulger sent an email, on July 30, 2015, advising an owner from Masco Interiors, Inc., that "[e]veryone will get all the money they are owed" and telling the owner that he would not let her down. N.T. Trial, 3/11/19, at 1414. When asked at trial if he ever had a meeting with the Subcontractors where he guaranteed them that they would get paid, Bulger stated, "I'm not sure I used the word guaranteed, but I had meetings with the subs saying I thought they should be paid fairly for the work they did." *Id.* at 1420. *See also id.* at 1416 (Bulger's stating that "[f]rom the very beginning[,] I had let everybody that was involved in any discussion know that it was my intention to pay the subs").

Based on the foregoing, the record supports that Longwood primarily guaranteed Hunley's debt to serve its own business interest of having residents move into their apartments as quickly as possible. While Bulger may have truly empathized with the Subcontractors' plight and felt a moral obligation that they should be paid fairly, he also was well aware of the importance of having residents move into their units on time and had concerns that some of the Subcontractors may refuse to work if they were not paid, leading Longwood to miss deadlines, lose money, and anger its prospective residents. However, once Bulger told the Subcontractors that Longwood would assure that they were paid, the Subcontractors continued working. Thus, the Leading Object Rule applies, and the Statute of Frauds does not bar Bulger's oral guaranty.

*Consideration*

Turning next to Longwood's lack-of-consideration argument, Longwood says "[a] contract of guaranty, like other contracts, is not enforceable unless based on a legal consideration, and such consideration is not found in a mere naked promise to pay the existing debt of another." Longwood's Brief I at 32 (quoting **Harr v. Perkins**, 6 A.2d 534, 536 (Pa. 1939)). It adds, "[a] moral obligation does not support a contract of guaranty." **Id.** (quoting **Deeter v. Dull Corp.**, 617 A.2d 336, 341 (Pa. Super. 1992)). Longwood claims that, at the May 22, 2015 meeting, "Longwood agreed to pay Hunley in reliance on Hunley's promise it would pay the Subcontractors[,]" and that "there was no promise made at the May 22 meeting, or at any other time, that Longwood would pay the Subcontractors if they agreed to keep working." **Id.** at 34. Further, Longwood insists that, "[w]hile the Subcontractors may have subjectively felt that the only way they were going to get paid was to keep working, this feeling or inference is not sufficient to establish consideration for a guaranty." **Id.** at 38.

The record belies this argument. As set forth *supra*, Swidorsky and Bierly both indicated that Bulger's assurances that Longwood would make sure they got paid led them to continue working, even though they had not been paid for the work they already did. While Bulger may not have made finishing the work a condition for getting paid for the outstanding invoices, it is unlikely that the Subcontractors would have moved forward with the work, knowing that Hunley had repeatedly failed to pay them, if Bulger had not given

assurances.[16]   The fact that the Subcontractors continued working, saving Longwood from costly delays, constituted sufficient consideration for Longwood's guaranty.

*Mutual Understanding of Terms*

Lastly, Longwood says that Bulger did not know the amount of Hunley's debt to the Subcontractors at the time he made the purported guaranty. Longwood advances that "[a]n enforceable contract is not made out unless each of its terms is shown with certainty and conciseness.  Price is a material element of a contract."  ***Id.*** at 39 (quoting ***Stevens v. Doylestown Bldg. & Loans Ass'n***, 183 A. 922, 922-23 (Pa. 1936)).  Longwood contends that "[a]n open-ended guaranty of an unknown amount is unenforceable, as it lacks the basic elements of a contract; namely, clear agreement on basic terms, such as: 'How much?'"  ***Id.*** at 40.  As such, Longwood avers that, "because … Bulger did not know what he was promising to 'make good,' his statements do not constitute an enforceable guaranty."  ***Id.*** at 41.

---

[16] We recognize that Raymond Mascaro of Masco Interiors, Inc., testified that he and the other Subcontractors did not think about leaving the job because "[w]e felt that the only way to get paid was to stay.  … No one gets paid for half of a job.  I don't pay people to do half a job, and I don't expect that."  N.T. Trial, 3/13/19, at 1781.  However, he also confirmed that he was led to believe that, if he stayed, he would be paid.  ***Id.*** at 1781-82.  Further, the testimony of Swidorsky and Bierly both support that they continued working because of Bulger's assurances, which implies that they would not have continued working if their source of payment was only the unreliable Hunley. ***See Woullard***, ***supra*** ("Upon appellate review[,] the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law.") (citations omitted).

We reject Longwood's argument, as the record supports that Bulger knew the amount of Hunley's debt to the Subcontractors at the time he made the guaranty. Various Subcontractors testified that Bulger told them that Longwood owes Hunley more money than Hunley owes the Subcontractors. *See* N.T. Trial, 3/13/19, at 1752 (Bierly's stating that Mr. Bulger "assured us, don't worry, we will get paid, more money is owed than we are owed…"); *id.* at 1753 (Bierly: "[Bulger] said if we didn't get paid by Hunley, that they would take care of it because more money was owed, that they would be able to make the subs whole. … I guess when the projects were completed, that Longwood would owe Hunley more than enough money to pay us"); *id.* at 1767 (Swidorsky's stating that Bulger told him that "Longwood owed Hunley more money than Hunley owed you guys and that we would be sure that you got paid"); *id.* at 1770 (Swidorsky's explaining: "It was simply said that there is enough money there for these projects and that we are assuring you that you will be paid. [Longwood] never flat out said they would pay us. They never said that Hunley would pay us. They just said we would be paid"); *id.* at 1777 (Mascaro's testifying that, at the May 22 meeting, "we were told that they had held back enough money from Hunley to make us all whole and that we would get paid"). Therefore, in making these statements, Bulger had to know how much Hunley owed the Subcontractors and the amount he was guaranteeing. Thus, this claim fails, and no relief is due on Longwood's first issue.

**Longwood's Second Issue**

In Longwood's second issue, it argues that the Subcontractors should not have been awarded pre-judgment interest against Longwood.[17] By way of background, following the trial court's verdict, the Subcontractors filed a motion to mold the verdict, requesting pre-judgment interest from the date of their invoices to the date of the judgment. ***See*** Subcontractors' Motion to Mold the Verdict, 5/7/20; Subcontractors' Supplement to Motion to Mold the Verdict, 9/21/20; ***see also*** Subcontractors' Trial Brief, 5/31/19, at 11 ("[T]he [S]ubcontractors will be filing a motion to mold the verdict to include interest from the date of their invoices to the date of the judgment, based on whatever amount this [c]ourt awards."). Longwood appears to have filed no response to the Subcontractors' motion to mold the verdict. Thereafter, the trial court — without explanation — awarded the Subcontractors the pre-judgment interest they requested, *i.e.*, pre-judgment interest from the date of their invoices to the date of the judgment.

With respect to pre-judgment interest, this Court has previously explained:

> "[A] court has discretion to award or not award pre[-]judgment interest on some claims, but must or must not award pre[-]judgment interest on others." ***Cresci Const. Services, Inc. v. Martin***, 64 A.3d 254, 258 (Pa. Super. 2013) (quoting, in part, ***Fidelity Bank v. Com. Marine and Gen. Assurance Co.***, 592

---

[17] While we continue referring to the Subcontractors collectively in this section of our writing, we note that Roland Pastucha Electric, Inc., did not assert a claim for pre-judgment interest. ***See*** Longwood's Brief I at 41 n.10; Subcontractors' Brief at 7. Thus, Roland Pastucha Electric, Inc., is not entitled to pre-judgment interest and is not included in the following analysis, despite our ongoing use of the term 'Subcontractors.'

F.Supp. 513, 522 (E.D. Pa. 1984)) (internal quotations and original brackets omitted). In accordance, Pennsylvania has followed the Restatement (Second) of Contracts § 354, which provides:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Restatement (Second) of Contracts § 354. Further, the comments to this section state, in pertinent part:

> *c. Where amount due is sufficiently definite.* Under the rule stated in Subsection (1), a party is not chargeable with interest on a sum unless its amount is fixed by the contract or he could have determined its amount with reasonable certainty so that he could have made a proper tender. Unless otherwise agreed, interest is always recoverable for the non-payment of money once payment has become due and there has been a breach. This rule applies to debts due for money lent, goods sold or services performed, including installments due on a construction contract. The fact that the breach has spared some expense that is uncertain in amount does not prevent the recovery of interest. The sum due is sufficiently definite if it is ascertainable from the terms of the contract, as where the contract fixes a price per unit of performance, even though the number of units performed must be proved and is subject to dispute. The same is true, even if the contract does not of itself create a money debt, if it fixes a money equivalent of the performance. It is also true, even if the contract does not fix a money equivalent of the performance, if such an equivalent can be determined from established market prices. The fact that the extent of the performance rendered and the existence of the market price must be proved by evidence extrinsic to the contract does not prevent the application of these rules.

***

*d. Discretionary in other cases.* Damages for breach of contract include not only the value of the promised performance but also compensation for consequential loss. The amount to be awarded for such loss is often very difficult to estimate in advance of trial and cannot be determined by the party in breach with sufficient certainty to enable him to make a proper tender. In such cases, the award of interest is left to judicial discretion, under the rule stated in Subsection (2), in the light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him.

Restatement (Second) of Contracts § 354 cmts. c, d….

This Court has expounded on Section 354 as follows:

[Section] 354 commands that pre[-]judgment interest is awarded as a matter of right in four limited circumstances, which all require an examination of the contract. In other words, a court examines whether the contract was to pay, or render a performance for, a monetary amount defined in the contract; render a performance for a monetary amount that can be calculated from standards set forth in the contract; or render a performance for a monetary amount calculated from the established market prices. The disputed amount must be either specified in the contract or ascertained from the terms of the contract such that at the time of the breach, the breaching party can proffer a tender. The disputed amount, in other words, must be liquidated at the time of the breach as a prerequisite for pre[-]judgment interest. In all other circumstances, including an award of consequential damages, pre[-]judgment interest is awarded as a matter of discretion.

***Cresci***, 64 A.3d at 264–65.

To illustrate, in ***Cresci***, the appellant entered into a contract with a construction company for it to build a home for the appellant for $184,730. ***Id.*** at 256. Aside from the cost of building the home, "the contract did not specify or refer to any monetary values, established market prices, or other fixed standards regarding a determination of mortgage expenses, legal expenses, inspection fees, and the costs of maintaining two homes in the event of a breach." ***Id.*** After some time, the construction company filed a complaint against the appellant, alleging that the appellant

impeded the efforts of the construction company in completing the contract, and claimed that the appellant owed $34,378.56 on the balance of the contract. *Id.* at 256–57. In turn, the appellant counterclaimed for, *inter alia*, breach of contract, asserting that the construction company "had failed to complete several of the contract's required obligations." *Id.* at 257. Following a jury trial, the jury found that the construction company breached the contract and awarded the appellant $66,000 in breach-of-contract damages. *Id.* However, the trial court did not award the appellant pre[-]judgment interest, determining that "the damages involved in this matter are simply not of the kind envisioned by § 354(1) of the Restatement[,]" and that the appellant "was adequately compensated by the jury's verdict, and no further pre[-]judgment interest was warranted." *Id.* at 258 (citations omitted).

On appeal, the appellant argued that "pre-judgment interest in a breach of contract matter is a legal right." *Id.* (citation omitted). He averred that "he was forced to incur additional mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two properties since the home was uninhabitable[,]" and "theorize[d] that because the sums he claim[ed] [were] ascertainable, § 354(1) of the Restatement (Second) of Contracts applie[d] and § 354(2) ... [did] not." *Id.* (internal quotation marks and citations omitted). This Court, however, disagreed. Significantly, we observed that the appellant did "not argue that the contract provided for the payment of additional mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two properties[,]" or that "these sums constituted the reasonable costs of completing the construction contract or correcting the defective work." *Id.* (internal quotation marks and citations omitted). Further, we reasoned:

> In the case before us, we examine the contract to determine whether [the a]ppellant is entitled to pre[-]judgment interest as of right. The contract specifically provided for the performance of a construction of a home in exchange for $184,730, a monetary amount defined by the contract. Thus, $184,730 is a liquidated, ascertainable sum.
>
> The contract, however, did not provide for a "performance" of "mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two properties." The contract also did not reference or permit a calculation of a

- 37 -

> monetary value for those items. [The construction company], therefore[,] could not have tendered a proffer to [the a]ppellant for those items, which necessarily required a breach of contract to render a "performance" of those items. [The construction company] is not charged with interest as of right on the jury's award of $66,000, because that amount was not fixed by the construction contract and [the construction company] could not have ascertained that sum by construing the terms of the contract. Accordingly, the jury's non-specific award of $66,000 does not represent a liquidated, ascertainable sum owed under the contract.
>
> The jury's award … "represents a loss incurred by [the a]ppellant as a consequence" of [the construction company's] breach "of the promised performance" to construct the home. Thus, contrary to [the a]ppellant's claim, an award of pre[-]judgment interest on consequential damages is not awarded as a matter of right but is instead left to the court's discretion. [The a]ppellant, however, elected not to order the trial transcript. Thus, this Court cannot ascertain whether the trial court abused its discretion in declining to award pre[-]judgment interest on an unliquidated sum.

> ***Cresci***, 64 A.3d at 264–66 (internal citations, original brackets, footnotes omitted…).

***Krishnan v. Cutler Group, Inc.***, 171 A.3d 856, 873-75 (Pa. Super. 2017)

(all emphasis omitted; some brackets added).

In the case *sub judice*, Longwood points out that the trial court's order "awarding pre-judgment interest to the Subcontractors is silent as to the legal basis for the award; that is, the [t]rial [c]ourt does not say whether its award of pre-judgment interest is made as a matter of law (*i.e.*, mandatory), or if it is made in the court's discretion." Longwood's Brief I at 42 (citation omitted). According to Longwood, "[i]n either case, the Subcontractors' claim for pre-judgment interest should have failed." ***Id.***

Considering first if the Subcontractors had a right to pre-judgment interest under Section 354(1), Longwood argues that "the relevant contract for examination is the oral contract of guaranty purportedly made with the Subcontractors by … Bulger on behalf of Longwood." *Id.* at 44.[18] It says that "the [t]rial [c]ourt found that the contract of guaranty between Longwood and the Subcontractors was as follows: if the Subcontractors kept working and did not walk off the job, Longwood would pay the Subcontractors all the money that Hunley owed them." *Id.* (citation omitted). Longwood contends that "[t]here were no other terms or details to be found in that purported contract — no amounts, no performance standard, no mathematical or value standards — just simply: keep working, and we will 'make good' on Hunley's debt." *Id.* at 44-45 (citation omitted). Longwood maintains that such a contract was not for a definite sum of money because, "[a]t the time of Longwood's purported guaranty, no one knew what the sum was, and rather such sum was only clearly adduced for the first time at the trial itself." *Id.* at 45 (citation omitted). As a result, it insists that "Longwood could not have proffered a tender — how would it have determined what to tender without knowing what was claimed to be owed to the Subcontractors?" *Id.* According to Longwood, "[i]n such circumstances, where a party cannot tender payment due to uncertainty as to the amount which is alleged to be owed, the imposition of

_____

[18] The Subcontractors do not dispute this assertion.

pre[-]judgment interest is unwarranted and inequitable." *Id.* at 45-46 (footnote omitted).

At the outset, Longwood has waived this argument, as it does not appear that Longwood raised these specific objections below. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Longwood claims that it preserved the issue of whether it is liable to the Subcontractors for pre-judgment interest in its Answer, New Matter, and Crossclaims to the Subcontractors' Amended Complaint, and in its concise statement of errors complained of on appeal. *See* Longwood's Brief I at 24. However, we see none of the above-stated arguments against awarding the Subcontractors pre-judgment interest in Longwood's Answer, New Matter, and Crossclaims.[19] Furthermore, regarding Longwood's concise statement, it is well-established that "[a]n issue raised for the first time in a concise statement is waived." *Carlino East*

_____

[19] Longwood also does not point us to exactly where in its Answer, New Matter, and Cross Claims it allegedly raised these claims. *See* Pa.R.A.P. 2117(c)(4) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the statement of the case shall also specify … [s]uch pertinent quotations of specific portions of the record, or summary thereof, **with specific reference to the places in the record** where the matter appears (*e.g.* ruling or exception thereto, etc.) as will show that the question was timely and properly raised below so as to preserve the question on appeal.") (emphasis added); Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information.").

*Brandywine, L.P. v. Brandywine Village Association*, 197 A.3d 1189, 1207 (Pa. Super. 2018) (citation omitted). We also reiterate that Longwood appears to have filed no response in opposition to the Subcontractors' motion to mold the verdict.

Nevertheless, even if not waived, we would reject Longwood's argument, as we have already determined that Bulger knew how much Hunley owed the Subcontractors and the amount he was guaranteeing. *See* Longwood's First Issue, *supra*. We restate that multiple Subcontractors testified that Bulger told them that Longwood owes Hunley more money than Hunley owes them, which means that Bulger knew how much the Subcontractors were owed at the time he made the guaranty. *Id.* In addition, Bulger acknowledged that the Subcontractors were bringing their unpaid invoices to him:

> [Longwood/PSC's attorney:] At some point[,] did you start going to [the S]ubcontractors directly to try and get copies of their invoices associated with their work on unit turnovers at Longwood?
>
> [Bulger:] I didn't go to them. They came to me with their invoices.
>
> [Longwood/PSC's attorney:] So they came to you and said what exactly?
>
> [Bulger:] They said we haven't been paid, and they must have talked amongst themselves, and they said we haven't been paid, and they started bringing me stacks of invoices.
>
> [Longwood/PSC's attorney:] Could you name some of the contractors that presented unpaid invoices to you?
>
> [Bulger:] Masco Construction, Riverview Flooring, Pastucha Electric. Let's see, I know there were a couple others. Tigano

Painting. I can't remember any others right now, but I think there were others.

[Longwood/PSC's attorney:] Were all these unpaid subcontractor invoices related to projects that were undertaken at Hunley's direction?

[Bulger:] Yes.

N.T. Trial, 3/11/19, at 1363-64.

Bulger also revealed that he wanted to pay the Subcontractors directly, which corroborates that he knew how much they were owed, but he was ultimately discouraged from doing so:

[Sodexo's attorney:] [Y]ou believe that [the Subcontractors] should be paid?

[Bulger:] I do believe they should be paid.

[Sodexo's attorney:] Because they did good work at a fair price; right?

[Bulger:] Yes.

[Sodexo's attorney:] Now, who stopped you from paying the [S]ubcontractors?

[Bulger:] Who stopped me from paying the contractors? I asked our attorneys if I could pay the contractors from the monies that were owed to Aufman at the time and --

[The court]: Did your attorneys give you some advice or direction?

[Bulger]: They did.

[The court]: We're done. That is the end of that topic.

[Sodexo's attorney:] And to be clear, besides the lawyers, I don't want to know, did you have discussions with any of your superiors at Longwood that told you -- and not that they got from their lawyers, but themselves [*sic*] -- to stop, to not issue checks to any of the [S]ubcontractors?

[Bulger:] No.

[Sodexo's attorney:] And that was contrary to your opinion; right? You believed that checks should be sent to the [S]ubcontractors; right?

[Bulger:] That's correct.

*Id.* at 1382-83.

Thus, even if not waived, we would determine that the record supports that Longwood knew how much it was guaranteeing, making the guaranty sufficiently definite for pre-judgment interest purposes. As such, we would reject Longwood's argument that "Longwood did not breach a contract to pay a definite sum of money, because Longwood did not know what that sum was." Longwood's Brief I at 45.[20]

_____

[20] Longwood raises for the first time in its reply brief that the Subcontractors failed to establish the time at which Longwood improperly withheld payment, and therefore, the date on which pre-judgment interest should have begun to run is unclear. It therefore argues that "pre-judgment interest cannot be awarded, because the [c]ourt cannot properly determine when it would begin to run." Longwood's Reply Brief at 21. We deem this issue waived because, in addition to not raising this claim below, Longwood presented it for the first time in its reply brief. ***Commonwealth v. Otero***, 860 A.2d 1052, 1054 (Pa. Super. 2004) ("Issues presented before this [C]ourt for the first time in a reply brief are waived.") (citation omitted). As our Supreme Court has explained:

> The opportunity for, and the extent of, a reply brief is limited. The Pennsylvania Rules of Appellate Procedure make clear that an "appellant may file a brief in reply to matters raised by [the] appellee's brief not previously raised in appellant's brief." Pa.R.A.P. 2113(a). Thus, an appellant is prohibited from raising new issues in a reply brief. Moreover, a reply brief cannot be a vehicle to argue issues raised but inadequately developed in appellant's original brief. When an appellant uses a reply brief to raise new issues or remedy deficient discussions in an initial brief, the appellate court may suppress the non-complying portions.

*(Footnote Continued Next Page)*

Further, assuming *arguendo* that the trial court should not have awarded the Subcontractors pre-judgment interest as a matter of right under Section 354(1), we would still discern no abuse of discretion by the trial court in awarding them pre-judgment interest under Section 354(2). As mentioned *supra*, if interest is not awarded as a matter of right, the trial court may use its discretion to award it "in … light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him." Restatement (Second) of Contracts § 354 cmt. d.

Longwood argues that "the fault of nonpayment rests not with Longwood, but rather with Hunley and its co-conspirators, ***and the Subcontractors, themselves***." Longwood's Brief I at 49 (emphasis in original). It elaborates:

> [T]he Subcontractors did not come to court with clean hands. The Subcontractors agreed to perform work for Hunley, a general contractor with no experience, reputation, or presence at the job site. Those agreements were entirely oral and no pre-work documentation, such as estimates, work orders, or work authorizations between Hunley and the Subcontractors were produced at trial. Longwood had no direct contract with the Subcontractors — Longwood engaged Hunley, who then engaged the Subcontractors under undefined, amorphous terms. The Subcontractors, themselves, were in the best position to limit their

***Commonwealth v. Fahy***, 737 A.2d 214, 218 n.8 (Pa. 1999) (most citations omitted).

Here, neither Longwood in its original brief, nor the Subcontractors in their responsive brief, raised the specific issue of when pre-judgment interest should have begun to run in this matter. As such, this claim is also waived on this basis.

loss exposure: they are the ones who allowed their invoices to Hunley to accumulate, unpaid, over the course of months. Some of their invoices were so old that the time for filing of mechanic's liens had lapsed by the time they approached Bulger at the May 22, 2015 meeting. Even though the quality of the Subcontractors work was not an issue, their business and recordkeeping practices were, at best, unprofessional, and certainly contributed to the confusion and chaos that concealed Hunley's fraud. Those practices also exposed the Subcontractors to an enormous receivable owed by an uncreditworthy counterparty (*i.e.*, Hunley).

As noted by the [t]rial [c]ourt, Longwood was the victim of a fraudulent conspiracy by and among Hunley, Aufman, Sepcic, McCollum, and Sodexo, whereby Longwood was defrauded out of hundreds of thousands of dollars. It was Hunley and its co-conspirators who engaged the Subcontractors to perform work at Longwood; then, Hunley charged Longwood for the work at a markup of nearly 130%. An integral part of that scheme was the concealment of the amounts the Subcontractors were actually charging Hunley for the work. This concealment persisted throughout, and well beyond, the time that … Bulger made his purported guaranty to the Subcontractors to pay the amounts Hunley owed them. The actual amounts owed to the Subcontractors were not made clear until this litigation ensued. By that time, Hunley had already extracted over $1.9 million from Longwood, and, despite Aufman's promises, failed to pay the required amounts through to the Subcontractors. Simply stated, it is not Longwood's fault that the Subcontractors have not yet been paid — it is the fault of Hunley and its co-conspirators.

Longwood's Brief I at 49-51 (internal citations omitted).

Longwood's argument fails to persuade us that the trial court would have abused its discretion by awarding the Subcontractors pre-judgment interest against Longwood under Section 354(2). To start, while the Subcontractors may have agreed to perform work for the unfamiliar Hunley, Longwood similarly went into business with Hunley without seemingly

conducting any research on the company.[21]     Moreover, unlike the Subcontractors, Longwood even chose to continue its relationship with Hunley despite receiving an anonymous letter in October of 2014, accusing McCollum of having an improper interest in Hunley.  Though Longwood investigated this letter, it wrongly concluded that no improper interest existed and took no further action, which permitted Hunley to continue conducting its fraudulent scheme at Longwood.     Furthermore, although Longwood criticizes the Subcontractor's recordkeeping and business practices, Longwood's practices seem equally as poor, given that it allowed McCollum to withhold invoices for long periods of time and grossly overpaid for Hunley's services over the course of nearly a year while Hunley performed no actual work.  Finally, to the extent that Longwood argues that the Subcontractors are to blame for permitting their invoices to go unpaid and accumulate, we point out that the Subcontractors considered stopping work at Longwood due to this non-payment but continued working after the meeting with Bulger in May of 2015, where he guaranteed that Longwood would make sure that the Subcontractors were paid.  The Subcontractors trusted his word and moved forward with the work, enabling Longwood to meet its deadlines and have residents move into their units, and yet the Subcontractors have gone years without seeing any payment from Longwood.  Thus, given the circumstances of this case, we

---

[21] According to the trial court, Longwood first hired Hunley to assist with a water pipe emergency in January of 2014, even though Hunley was not incorporated at that time.  TCO I at 2-3.

would conclude that the trial court would not have abused its discretion by awarding the Subcontractors pre-judgment interest against Longwood under Section 354(2).  No relief is due on Longwood's second issue.

## Longwood's Third Issue

In Longwood's third and final issue, it asserts that its obligation to pay the Subcontractors' judgment should be stayed pending Longwood's receipt of all amounts awarded to it from Hunley, Aufman, Sepcic, McCollum, and Sodexo.  To begin, it says Pennsylvania Rule of Civil Procedure 3121(b)(2) permits a trial court to stay execution of judgment when justice so requires.  Rule 3121(b)(2) provides:

> (b) Execution may be stayed by the court as to all or any part of the property of the defendant upon its own motion or application of any party in interest showing
>
> …
>
> (2) any other legal or equitable ground therefor.

Pa.R.Civ.P. 3121(b)(2).

Relying on Rule 3121(b)(2), Longwood says that "equity and the interests of justice favor requiring the [d]efendants [(*i.e.*, Hunley, Aufman, Sepcic, McCollum, and Sodexo)] to first pay Longwood its gross amount due of $1,352,769.68 (representing $933,220.71 in direct damages plus $419,548.97 for indemnification), before Longwood has to pay the Subcontractors and before the Subcontractors can initiate collection proceedings against Longwood."  Longwood's Brief I at 53 (emphasis omitted; citation omitted).  Longwood emphasizes that it is a defrauded non-profit

organization, and that the Subcontractors are not blameless for the situation in which they now find themselves due to their purportedly poor business practices discussed *supra*. **Id.** at 54, 55. To Longwood, "allowing the Subcontractors to collect from Longwood would mean that Longwood, once again, would be making an outlay of cash, at its own expense and the expense of its residents, falling deeper into the financial hole created by McCollum and Hunley's fraudulent conspiracy." Longwood's Reply Brief at 26-27.

In addition to the interests of justice, Longwood advances that, as a guarantor, its obligation to pay the Subcontractors is triggered only upon default by the principal debtors, namely, Hunley, Aufman, Sepcic, and McCollum. Longwood's Brief I at 56-57. **See also McIntyre Square Associates v. Evans**, 827 A.2d 446, 451 n.7 (Pa. Super. 2003) ("While both guaranty and surety agreements are agreements to be liable for the debt of another, the principal difference is that the creditor may look to the surety for immediate payment upon the debtor's default, without first attempting to collect the debt from the debtor, whereas the creditor must first seek payment from the debtor before going after a guarantor.") (citations omitted). As such, it also argues that the Subcontractors "should not be permitted to attempt to execute on their judgment against Longwood unless and until they exhaust collection efforts against Hunley, Aufman, Sepcic, and McCollum." Longwood's Brief I at 57.

"The grant of a stay of execution is within the sound discretion of the trial court and its decision will not be disturbed absent a clear abuse of that

discretion." ***In re Upset Sale, Tax Claim Bureau of Berks County***, 479 A.2d 940, 946 (Pa. 1984) (citations omitted). Here, we discern no clear abuse of discretion by the trial court.[22] Initially, with respect to Longwood's claim that justice requires a stay of execution, we point out that the Subcontractors have also faced great financial difficulties as a result of not being paid for their work in this case. ***See*** N.T. Trial, 3/13/19, at 1782 (Mascaro's testifying that "I had to extend my line of credit a hundred thousand dollars. I was two weeks from being out of business"); ***id.*** at 1786 (Jerry Tigano of Tigano Painting and Wallcovering stating that, as a result of this matter, he "ha[s] no savings, it's all gone. … My Visa and MasterCard [are] at the max. I'm just surviving. It's a shame. I'm getting upset"); ***id.*** at 1790 (Roland Pastucha of Roland Pastucha Electric, Inc., confirming that he had to borrow additional money to make it through this time). While Longwood again says that the

---

[22] Based on our review of the record, it does not appear that the trial court specifically explained why it denied Longwood's request for a stay of execution. However, Longwood does not argue that the trial court abused its discretion by failing to provide reasons for its decision, nor does Longwood ask us to remand this matter for preparation of an additional Rule 1925(a) opinion by the trial court. Further, based on our review of the record, we are able to glean why the trial court denied Longwood's request. ***See*** N.T. Trial, 3/13/19, at 1782, 1785-86, 1790 (trial court's asking multiple Subcontractors if they had to borrow additional monies to make it through this ordeal); TCMNV at 25 (finding that "Bulger's promises were the only reason the Subcontractors continued working"); ***see also Widger***, 237 A.3d at 1158 n.5 ("Although we do not approve of or sanction the trial court's failure to comply with its obligations under Rule 1925(a), the lack of a Rule 1925(a) opinion does not preclude this Court's review of the merits of [the a]ppellant's issues based upon our review of the record, including the notes of testimony from [the a]ppellant's trial.").

Subcontractors' business practices enabled the fraud to transpire, we do not view the Subcontractors as any more at fault than Longwood for having let the fraud occur. *See* Longwood's Second Issue, *supra*. Further, as the Subcontractors aptly recognize, "Bulger's promises were the only reason [the] Subcontractors continued working[,]" and the work they performed allowed Longwood to continue turning over units and making money. *See* Subcontractors' Brief at 24. As such, it would be unfair to grant Longwood a stay of execution at the Subcontractors' expense. For these reasons, we reject Longwood's argument that the trial court abused its discretion in denying Longwood's request for a stay of execution based on the interests of justice.

Additionally, with respect to Longwood's argument that it is a guarantor and that the Subcontractors must first seek payment from Hunley, Aufman, Sepcic, and McCollum, Longwood provides no authority that a trial court must grant a stay of execution in such circumstances. *See In re S.T.S., Jr.*, 76 A.3d 24, 42 (Pa. Super. 2013) ("[M]ere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of a matter.") (citations omitted). We also point out that Longwood itself recognizes that Hunley, Aufman, Sepcic, and McCollum are unlikely to pay, *see* Longwood's Brief I at 53, and, in fact, have not paid on the unpaid invoices to date. And, again, we emphasize that the Subcontractors continued working, despite not getting paid, because Bulger assured them that Longwood would make good on Hunley's debt, which still has not happened. As the Subcontractors should not face any more delays in receiving their money, we discern no clear abuse

of discretion by the trial court in denying a stay of execution to Longwood on this basis either.

Overall, none of Longwood's issues in its appeal at 733 WDA 2021 warrant relief. We therefore affirm the judgment entered at GD 18-012048 with respect to Longwood.

**Sodexo's Appeals at 676 WDA 2021 and 677 WDA 2021**

We turn next to Sodexo's appeals at 676 WDA 2021 and 677 WDA 2021.[23] In its appeals, Sodexo raises two questions for our review:

> 1. Whether Longwood was entitled to common-law indemnification from Sodexo for the $419,548.97 that the [t]rial [c]ourt found Longwood owed by contract to the [S]ubcontractors, despite that (a) Longwood's common-law indemnification rights were superseded by a contractual indemnification provision, which the [t]rial [c]ourt correctly held was not satisfied; (b) Longwood's liability to the [S]ubcontractors sounded in contract, not tort; and (c) Longwood had already recovered as damages the amounts unpaid to the [S]ubcontractors.

> 2. Whether Longwood was "the prevailing party" under the Longwood Management Agreement, such that Longwood was entitled to $1,062,053.67 in attorney[s'] fees and expenses, despite that both Longwood and Sodexo obtained judgments in their favor.

Sodexo's Brief at 3-4.

**Sodexo's First Issue**

In Sodexo's first issue, it challenges the trial court's determination that Sodexo — along with Hunley, McCollum, Aufman, and Sepcic — must

---

[23] Sodexo filed a consolidated brief for its appeals at 676 WDA 2021 and 677 WDA 2021.

indemnify Longwood for all sums paid by Longwood to the Subcontractors.[24]

In making this ruling, without providing any legal authority in support, the

trial court conveyed in its memorandum and amended non-jury verdict that:

> Hunley, Aufman, Sepcic, McCollum, and Sodexo must indemnify Longwood for any amounts it pays to the Subcontractors pursuant to this [v]erdict because this [c]ourt grants Longwood's crossclaim.
>
> Longwood would not have been liable to the Subcontractors but for the [c]ontract of [g]uaranty made by … Bulger. The true culprits are Hunley represented by Aufman, Sepcic, and McCollum who conducted the fraudulent scheme and extracted the funds from Hunley, causing it to default on its debt to the Subcontractors. This [c]ourt has already pierced Hunley's … corporate veil, therefore Aufman, Sepcic, and McCollum are also personally liable under the crossclaim. This [c]ourt has additionally found Sodexo vicariously liable for McCollum's actions. Therefore, Hunley, Aufman, Sepcic, McCollum, and Sodexo must indemnify Longwood for any amounts it pays to the Subcontractors by virtue of this [v]erdict.

TCMNV at 25.

Later, in its Rule 1925(a) opinion, the trial court provided a legal basis

for its determination for the first time, explaining:

> "The right to indemnity arises by operation of law and will be allowed where necessary to prevent an[] unjust result." **City of Wilkes-Barre v. Kaminski Bros., Inc.**, 804 A.2d 89, 92 (Pa. Cmwlth. 2002). Indemnity is an equitable remedy available at common law, which "shifts the entire responsibility for damages from a party who, without any fault, has been required to pay because of a legal relationship to the party at fault." **Id.** The Commonwealth Court clarified that indemnity[] "is a fault-shifting

---

[24] **See** Trial Court Judgment at GD 18-012048, 5/11/21, at 2-3 ("Hunley, McCollum, Aufman, Sepcic, and Sodexo shall, jointly and severally, indemnify Longwood for all sums paid by Longwood to [the Subcontractors], or any of them, and all sums collected from Longwood by [the Subcontractors], or any of them[.]").

mechanism that comes into play when a [party] held liable by operation of law seeks to recover from a defendant whose conduct actually caused the loss." *Id.*

Although this [c]ourt[] determined that Longwood was not entitled to indemnity pursuant to the Longwood Management Agreement, indemnity via a specific contractual obligation was only one avenue available to Longwood.[25]   Longwood may also obtain common law indemnity as an equitable remedy in relation to Longwood's [c]rossclaim.

As this [c]ourt explained in its April 14, 2020 … Memorandum and Non-Jury Verdict, absent the … breach of contract and fraud, Longwood would not have overpaid Hunley for over $900,000.00 and Longwood would not be getting back-charged for over $400,000.00 in Subcontractor invoices, which should have been paid by Hunley.  This is because it was Hunley, Aufman, Sepcic, McCollum, and Sodexo who took part in a fraudulent scheme and extracted funds from Hunley, which caused Hunley to default on its debt to the Subcontractors.  Despite the fact that Longwood had already overpaid Hunley for the work Longwood expected to be completed, Hunley's default on its debt to the Subcontractors forced Longwood to guaranty the Subcontractors payment in order for the Subcontractors to continue working, and for Longwood to avoid significant additional losses.

Accordingly, while this [c]ourt found that Longwood was liable to the Subcontractors based upon Longwood's [c]ontract of [g]uaranty, this [c]ourt correctly determined that Sodexo, McCollum, Hunley, Aufman, and Sepcic must indemnify Longwood for any payment made by Longwood to the Subcontractors….  This makes sense because the judgment on the Subcontractors' unpaid invoices is a debt that Longwood would not have incurred **but for** Sodexo's breach of contract and Hunley's, Aufman's, Sepcic's, and McCollum's fraud, for which, again, Sodexo was vicariously liable.

Sodexo again complains that this [c]ourt's determination regarding indemnity was *sua sponte* action, which deprived

---

[25] The Longwood Management Agreement contained an indemnity provision, which the trial court determined did not require Sodexo to indemnify Longwood for reasons discussed *infra*.

Sodexo of its due process rights.[26]    However, as mentioned previously, there is ample precedent that permits this [c]ourt to amend pleadings to conform with the evidence presented at trial, at least where such an amendment will not result in unfair surprise or prejudice.  *See Sutton v. Miller*, 592 A.2d 83, 89 [(Pa. Super. 1991)] (holding that, in the absence of any prejudice, given the well-settled principle that amendment is available at any stage of the proceedings, a court may *sua sponte* amend the pleadings on its own initiative).

Here, Sodexo, McCollum, Aufman, and Sepcic were, at all times, aware of Longwood's claim that Sodexo, McCollum, Hunley, Aufman, and Sepcic should be the parties ultimately responsible for paying the Subcontractors, or indemnifying Longwood after Longwood paid the Subcontractors.  Whether this occurred via contractual indemnity or common law indemnity is of little moment.  The substance of Longwood's claims put Sodexo on notice with regard to both, and this [c]ourt acted appropriately in amending said claims in the interest of justice.  Thus, Sodexo's argument that this [c]ourt's decision deprived Sodexo of its due process rights is without merit.

Trial Court Opinion ("TCO II"), 8/2/21, at 38-40 (emphasis in original).

On appeal, Sodexo wages a three-prong argument as to why the trial court's indemnification award should be reversed.  First, it advances that the Longwood Management Agreement's contractual indemnification clause precluded any common-law indemnification.  It asserts that our Supreme Court "has long held that common-law indemnification is 'not apposite where, as here, there is a written contract setting forth the rights and duties of the parties.'"  Sodexo's Brief at 14 (citing *Eazor Exp., Inc. v. Barkley*, 272 A.2d

---

[26] For context, in Sodexo's Rule 1925(b) concise statement, Sodexo complained, *inter alia*, that Longwood's crossclaim only sought contractual indemnification from Sodexo related to the Subcontractors' claims, and that the trial court improperly raised the issue of whether Sodexo had a common law duty to indemnify Longwood *sua sponte*.

893, 895 (Pa. 1971)). Second, Sodexo avers that "a party can be indemnified under the common law only for liability that sounds in **tort**, not contract." **Id.** at 17-18 (emphasis in original). It explains that "[t]he party seeking common-law indemnification must be a 'tortfeasor' liable to a third-party 'tort victim.'" **Id.** at 18 (quoting **City of Wilkes-Barre**, 804 A.2d at 92 (Pa. Cmwlth. 2002)). In contrast, Sodexo says that, here, "Longwood's liability to the [S]ubcontractors undoubtedly sounded in contract, not tort. The non-jury verdict specifically states that Longwood owed these amounts to the [S]ubcontractors for 'Breach of Contract.' And the opinion further clarifies that Longwood breached an 'enforceable contract of guaranty.'" **Id.** (citations omitted). Finally, Sodexo contends that, although the two, above-stated errors are independent and sufficient reasons to reverse the indemnity award, the trial court's indemnification ruling also should be reversed because it compensated Longwood **twice** for the same loss. According to Sodexo, "[t]he indemnity award was a double-recovery because the damages award (for breach of contract and fraud) had **already** compensated Longwood for the same thing: money still owed to the [S]ubcontractors." **Id.** at 19 (emphasis in original).

*Common-Law Indemnification Precluded by Contract*

For multiple reasons, we agree with Sodexo that the trial court erred and/or abused its discretion in determining that Longwood was entitled to common-law indemnification from Sodexo. To begin, in the Longwood Management Agreement, Sodexo and Longwood specifically contemplated

indemnification only in certain circumstances. In that contract, they agreed that:

> Except as otherwise expressly provided in this Agreement, Sodexo and Client shall defend, Indemnify and hold each other harmless from and against all claims, liability, loss and expenses, including reasonable costs, collection expenses and attorneys' fees, which may arise because of the sole negligence, misconduct, or other fault of the Indemnifying party, its agents or employees in the performance of its obligations under this Agreement.

*See also* Longwood's Exhibit P-2 ("Longwood Management Agreement") at 7.[27]

_____

[27] None of the trial exhibits were transmitted to us with the certified record. Despite an informal inquiry with the trial court, we were unable to obtain them. "Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials." *Note* to Pa.R.A.P. 1921. Generally, "[a]n appellate court may consider only the facts which have been duly certified in the record on appeal." *Id.* However, "[p]arties may rely on the list of documents transmitted to the appellate court and served on the parties. … If the list shows that the record transmitted is complete, but it is not, the omission shall not be a basis for the appellate court to find waiver." *Id.* "This principle is consistent with the Supreme Court's determination in *Commonwealth v. Brown*, … 52 A.3d 1139, 1145 n.4 ([Pa.] 2012)[,] that where the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the Reproduced Record, even though it was not in the record that had been transmitted to the Court." *Id.*

Here, in the list of documents transmitted to this Court for Sodexo's appeals at docket numbers 676 WDA 2021 and 677 WDA 2021, 'Exhibits' are listed. However, it appears that those 'Exhibits' are exhibits from Longwood's response in opposition to summary judgment, filed on December 21, 2018, and do not include the exhibits admitted at trial. Though we usually may not consider documents that are not in the certified record, no party disputes the accuracy of the Longwood Management Agreement, or the report of Longwood's expert, which we discuss *infra*, that are contained in Sodexo's reproduced record. Therefore, we will consider both documents in our review despite the fact that they are not included in the certified record.

The trial court ascertained that this contractual provision did not require Sodexo to indemnify Longwood for its losses in this case, opining:

> This [c]ourt finds that Longwood's damages fall outside the scope of the Longwood Management Agreement's Indemnity [p]rovision. This provision allows recovery for losses which may arise because of the "sole negligence, misconduct, or other fault of the indemnifying party…." The language is unambiguous, the word "sole" modifies all adjectives in the list. The provision is not triggered when the misconduct involves the contribution of third parties. In the case at hand, the misconduct involved Hunley, Aufman, and Sepcic[,] thereby making the misconduct outside the scope of the provision.[2]
>
> > [2] Longwood's arguments that such interpretation violates public policy and that it encourages fraud are unpersuasive. Indemnity provisions are the product of party autonomy and may be tailored as the parties deem fit. The main purpose of indemnity provisions is to contractually alter the default allocation of risk under the law. If parties decide to only alter the allocation of risk in instances involving a sole negligence or misconduct, that is their prerogative and it does not violate public policy. Any losses for misconduct falling outside the scope of the provision are recoverable through the remedies provided by the law.

TCMNV at 14 (citations omitted).

Despite the parties' agreement for when indemnification would occur, the trial court disregarded the contract and ordered Sodexo to indemnify Longwood for the Subcontractors' claims under the common law. This was improper.

As Sodexo discerns, our Supreme Court has cautioned that, when a contract sets forth the rights and duties of the parties, the terms of that contract must govern. To illustrate, in *Eazor*, Eazor — a common carrier by motor vehicle — leased a tractor-trailer from Barkley. *Eazor*, 272 A.2d at

894. Under the lease agreement, Barkley also supplied a driver, Matil. *Id.* While transporting cargo owned and shipped by Continental, an accident occurred, damaging the cargo. *Id.* Continental recovered a judgment against Eazor in federal court, which Eazor paid. *Id.* Eazor then sought to recover from Barkley and Matil the amount of the judgment it had paid to Continental. *Id.* After Eazor sued, the trial court determined that Eazor could not recover under a claim of either an express or implied contract of indemnity, and granted Barkley and Matil's preliminary objections in the nature of a demurrer. *Id.* On appeal, our Supreme Court upheld the trial court's decision. *Id.* In doing so, the Court initially noted that it could not find in the lease any express agreement by Barkley to be responsible for any damage to any cargo. *Id.* In addition, the Court also rejected Eazor's argument that the Court, in previous cases, had recognized an implied contract of indemnity in favor of a person who, without active fault on his part, was legally obliged to pay damages caused by the negligence of another. *Id.* at 895.[28] The *Eazor* Court deemed such cases to be inapposite "where, as here, there is a written contract setting forth the rights and duties of the parties. The contract must then govern. As

---

[28] "Quasi-contracts, or contracts implied in law, are to be distinguished from express contracts or contracts implied in fact." *Sevast v. Kakouras*, 915 A.2d 1147, 1153 n.7 (Pa. 2007) (citation omitted). "Unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice." *Id.* (citation and bracket omitted).

we have already observed, the instant contract does not support [Eazor's] claim." *Id.*

*Eazor* is instructive to the matter at hand. The Longwood Management Agreement specifically addresses indemnity and requires Sodexo to indemnify Longwood in certain instances. As *Eazor* suggests, Longwood cannot circumvent this provision, which it agreed to, by seeking common-law indemnity. Instead, the contract must govern. Thus, we agree with Sodexo that the contractual indemnification clause in the Longwood Management Agreement precluded any common-law indemnification in this matter.[29, 30]

---

[29] We recognize that, in *City of Wilkes-Barre*, claims for both common-law indemnification and contractual indemnification were permitted to be advanced. However, "decisions rendered by the Commonwealth Court are not binding on this Court." *See Beaston v. Ebersole*, 986 A.2d 876, 882 (Pa. Super. 2009) (*en banc*) (citation omitted). In addition, it appears that, in that case, no one raised the argument that common-law indemnity claims are precluded where a contract setting forth the rights and duties of the parties exists.

[30] In response to Sodexo's argument, Longwood claims that the indemnification award constitutes "damages flowing proximately from the fraud committed by Sodexo[,]" and that "[a] person who makes a fraudulent misrepresentation of material fact to another person is responsible for all injuries resulting from that other person's reliance on the fraudulent misrepresentation." Longwood's Brief at 676 WDA 2021 and 677 WDA 2021 ("Longwood's Brief II") at 38 (citation omitted). Longwood goes on to purportedly distinguish *Eazor* and related cases on the basis that "they stand for the indeed well-accepted principle that when the parties' relationship is predominantly contractual, tort claims and associated tort theories of damages are barred. The [t]rial [c]ourt specifically ruled that this was not the case here." *Id.* at 43; *see also* TCMNV at 20-21 (determining that the gist-of-the-action doctrine did not bar Longwood's tort claims against Sodexo).

*(Footnote Continued Next Page)*

*Longwood's Liability to the Subcontractors Arose Through a Contract of*

*Guaranty*

Nevertheless, even if the Longwood Management Agreement did not preclude Longwood's common-law indemnification claim in this matter, we would agree with Sodexo that common-law indemnification does not apply here because Longwood's liability to the Subcontractors arose through a contract of guaranty.   With respect to common-law indemnity, our Supreme Court has explained:

> The right of indemnity rests upon a difference between the primary and the secondary liability of two persons each of whom is made responsible by the law to an injured party. ***It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable.***   The difference between primary and secondary liability is not based on a difference in degrees of negligence or on any doctrine of comparative negligence, — a doctrine which, indeed, is not recognized by the common law.  It depends on a difference in the character or kind of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person.  Secondary liability exists, for example, where there is a relation of employer and employee, or principal and agent; if a tort is committed by the employee or the agent recovery may be had against the employer or the principal on the theory of *respondeat superior*, but the person primarily liable is the employee or agent who committed the tort, and the employer or principal may recover indemnity from him for the damages which he has been obliged to pay.  Another example, and perhaps the most familiar one, is

---

We are unpersuaded by Longwood's argument.  Even though Longwood succeeded on its fraud claim in addition to its breach-of-contract claim against Sodexo, that does not negate the fact that the parties had an express contract that does not allow for indemnification in this matter.

when a pedestrian is injured by falling in a hole in the pavement of a street; in such a case the abutting property owner is primarily liable because of his failure to maintain the pavement in proper condition, but the municipality is secondarily liable because of its having neglected to perform its duty of policing the streets and seeing to it that the property owners keep them in repair; if therefore the injured person chooses to bring suit against the municipality[,] the latter can recover indemnity from the property owner for the damages which it has been called upon to pay. Many other illustrations might, of course, be given, as, for example, where a person injured by the leakage of gas from a defective pipe recovered damages from the gas company which maintained the pipe, the gas company was held entitled to recover indemnity from a street railway company whose negligent excavation in the street had caused the pipe to break. So likewise, where there was an explosion in one of the mains of a gas company causing the collapse of a vault under the sidewalk and injuring two persons on the pavement, and the latter brought suit and recovered judgment against the property owner for failure to maintain the pavement in a safe condition as required by law, the property owner, having paid the judgment, was allowed recovery of indemnity from the gas company which had negligently created the condition. So, where the owners of a store property who maintained an opening in their sidewalk were obliged to pay damages for injuries received by a pedestrian who fell into the opening and was injured, recovery of indemnity was allowed from a contractor employed by them to take waste material from the premises, and who, in the course of the work, removed the iron grills above the opening and did not properly guard it; obviously the contractor's was the primary, the property owners' the secondary liability for the injury which occurred….

Without multiplying instances, it is clear that the right of a person vicariously or secondarily liable **for a tort** to recover from one primarily liable has been universally recognized. **But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.** In the case of concurrent or joint tortfeasors, having no legal relation to one another, each of them

owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other. The universal rule is that when two or more contribute by their wrongdoing to the injury of another, the injured party may recover from all of them in a joint action or he may pursue any one of them and recover from him, in which case the latter is not entitled to indemnity from those who with him caused the injury.

**Builders Supply Co. v. McCabe**, 77 A.2d 368, 370-71 (Pa. 1951) (internal citations omitted; emphasis added).

In the case *sub judice*, Longwood's liability to the Subcontractors did not arise due to some imputed or constructive fault it had for a tort. Instead, as Sodexo points out, Longwood's liability to the Subcontractors sounded in contract, as the trial court found that Longwood made an enforceable contract of guaranty with the Subcontractors and then breached it. Sodexo's Brief at 18. Consequently, because Longwood's liability to the Subcontractors stemmed from a contract of guaranty and not from some responsibility it had under the law to the Subcontractors for their tort damages despite being itself blameless, Longwood would not be entitled to common-law indemnification for this reason as well.[31]

---

[31] Longwood argues that "the reason that Longwood defaulted on its oral guaranty to the Subcontractors (and, ostensibly, made that guaranty in the first place) is because of the fraud perpetrated by Hunley, Aufman, Sepcic, McCollum, and Sodexo." Longwood's Brief II at 27-28. Yet, as Sodexo observes, "it is **Longwood's** liability (as Longwood is the party seeking indemnification) that must sound in tort. And Longwood does not — and could
*(Footnote Continued Next Page)*

*Double Recovery*

Finally, on top of the two above-stated, independent reasons for reversing the trial court's indemnification ruling, the trial court's indemnification award compensated Longwood twice for the same loss, as Sodexo claims.[32] In calculating Longwood's damages, Longwood's damages expert — Brian Kassalen, CPA, CFF — first calculated the amount of revenue

---

not — dispute that its liability to the [S]ubcontractors sounds in **contract**." Sodexo's Reply Brief at 6 (citations omitted; emphasis in original). Further, if Longwood thought that the fraud caused it to incur the debt with the Subcontractors, it should have sought as damages in its fraud action the amount of money it owed to the Subcontractors. As discussed *infra*, Longwood did, in fact, seek such damages, and received them, in its fraud action against Sodexo, McCollum, Hunley, Aufman, and Sepcic.

[32] Sodexo did not raise this specific issue of double-recovery in its Rule 1925(b) concise statement. Nevertheless, we decline to deem it waived because, as Sodexo observes in its reply brief, the trial court did not provide a legal basis for why it was ordering indemnification until its Rule 1925(a) opinion. **See** Sodexo's Reply Brief at 10 n.5 ("[T]he [t]rial [c]ourt initially offered no justification for its *sua sponte* indemnification ruling, and only later explained, in its [Rule] 1925[(a)] opinion, that it was invoking 'equitable' authority to reach a result that it thought 'makes sense.' … Sodexo's double-recovery argument is a direct response to this late-arriving assertion of fairness.") (citations omitted); Sodexo's Post-Trial Motion, 6/12/20, at 53 (indicating that the trial court's basis for awarding indemnification in its non-jury verdict and memorandum is unclear, and was made "without any legal or factual citations"); **see also Commonwealth v. Evans**, 2021 WL 4352310, at *3 n.4 (Pa. Super. Sept. 24, 2021) (declining to find that the appellant waived an issue by not raising it in his Rule 1925(b) statement where the trial court discussed the issue for the first time in its Rule 1925(a) opinion); Pa.R.A.P. 126(b) (unpublished non-precedential memorandum of the Superior Court filed after May 1, 2019, may be cited for persuasive value). We note that Sodexo did complain in its post-trial motion that Longwood received a windfall, and specifically pointed out that the trial court's indemnification award of $419,549.97, was already included by Longwood as part of its loss in its damages calculation. Sodexo's Post-Trial Motion at 2.

recognized by Hunley (as shown on Hunley's financial statements that were prepared by Aufman) and paid by Longwood, which amounted to $1,902,165.15. *See* Longwood's Exhibit 17 ("Kassalen's Expert Report") at 8, 9.[33, 34] Kassalen then analyzed Hunley's contract costs (*i.e.*, all direct costs, such as material, labor, and subcontracting costs). *Id.* at 11.[35] In ascertaining Hunley's total net contract costs, Kassalen did not include $443,623.60 in amounts that Hunley did not actually pay to its subcontractors. *Id.* at 8, 12.[36] Thus, he determined that Hunley's total net contract costs that Hunley actually paid amounted to $843,293.68. *Id.* at 8. He then multiplied $843,293.68 by the industry gross average profit percentage for general contractors in the commercial sector during the relevant time period, which was 14.9%. *Id.* at 8, 13. By multiplying them together, Kassalen discerned

---

[33] "CPA" stands for Certified Public Accountant, and "CFF" stands for "Certified in Financial Forensics." Kassalen's Expert Report at 15.

[34] Sodexo's reproduced record identifies Kassalen's expert report as Longwood's Exhibit 180. Based on our review of the trial transcripts, however, we believe it was admitted at trial as Longwood's Exhibit 17. N.T. Trial, 3/8/19, at 1065, 1075-76, 1090, 1101, 1130.

[35] At trial, Kassalen elaborated on the meaning of 'contract costs,' saying that "[w]ith respect to Hunley, it is all of the subcontractor costs that [it] would have incurred for the subcontractors that bid the work for them, either drywall work, carpet work, painting work, electrical work, whatever they be." N.T. Trial, 3/8/19, at 1120.

[36] The $443,623.60 figure was comprised of $218,135.00 owed to Masco Interiors, Inc.; $32,005.00 owed to Roland Pastucha Electric, Inc.; $85,219.57 owed to Riverview Carpet & Flooring, Inc.; $86,597.00 owed to Tigano Painting & Wallcovering; and $24,514.63 owed to Renaissance Paint & Flooring and Bluefrog Plumbing. *See* Kassalen's Expert Report at Exhibit 34.

that a reasonable profit for Hunley would have been $125,650.76, and that therefore, the amount of money that Longwood should have paid to Hunley was $968,944.44 (in other words, the sum of $843,293.68 and $125,650.76). *Id.* at 8. He then subtracted $968,944.44 from the contract income recognized by Hunley and paid by Longwood ($1,902,165.15) to conclude that the net loss suffered by Longwood due to overinflated payments was $933,220.71. *Id.* The trial court awarded Longwood this exact amount in damages in Longwood's action against Sodexo, McCollum, Hunley, Aufman, and Sepcic. *See* Trial Court Judgment at GD 15-015968, 5/11/21.

At trial, Kassalen confirmed that he excluded the amounts unpaid to subcontractors from Hunley's contract costs, testifying:

> [Sodexo's attorney:] Let's turn back to the calculation for a couple minutes, page 8 of your report again. Looking at this calculation, I see that you've calculated a net loss suffered by Longwood of $933,000; correct?
>
> [Kassalen:] Yes.
>
> [Sodexo's attorney:] And change. If you add that back into -- looking two lines up from that, the amounts unpaid to subcontractors of $443,000; correct?
>
> [Kassalen:] Yes.
>
> [Sodexo's attorney:] Do you include those amounts unpaid to subcontractors in the net loss suffered by Longwood?
>
> [Kassalen:] My calculation takes A, which is the contract income recognized by Hunley and paid by Longwood, and subtracts out the Item C[,] which is the net amount that should have been paid to Hunley which excludes the $443,000.
>
> [Sodexo's attorney:] So you attribute damages in the amount of unpaid subcontractor bills to Longwood's loss?
>
> [Kassalen:] Yes.

- 65 -

[Sodexo's attorney:] So it is your position that those amounts unpaid to subcontractors are actually amounts that should be paid to Longwood?

[Kassalen:] The $993,000 is the amount I say should be paid to Longwood.[37]

[Sodexo's attorney:] And that includes that $443,000 that is owed to the subcontractors?

[Kassalen:] Yes.

[Sodexo's attorney:] So it is your position that under your analysis[,] it is not the subcontractors that are owed that money, it is Longwood?

[Kassalen:] The subcontractors haven't been paid.

[Sodexo's attorney:] Right, but this analysis doesn't factor in that that will go to the subcontractors. This analysis sends that to Longwood; is that correct?

[Kassalen:] That is correct.

N.T. Trial, 3/8/19, at 1171-72.

In addition, Sodexo points out that:

The duplication is glaringly apparent when the two awards — indemnity and damages — are broken down on a subcontractor-by-subcontractor basis. A simple comparison shows that the indemnification award and the damages award compensate Longwood for the same [l]osses. ***Compare, e.g.***, [Trial Court Judgment at GD 18-012048, 5/11/21, at 2-3] (requiring Sodexo to indemnify Longwood for "$218,135.00" owed to Masco Interiors, Inc.) ***with*** [Kassalen's Expert Report at Exhibit 34] (requiring Sodexo to pay damages for "$218,135.00" owed to Masco Interiors, Inc.); and [Trial Court Judgment at GD 18-012048, 5/11/21, at 2-3] (requiring Sodexo to indemnify Longwood for "$86,597.00" owed to Tigano Painting and Wallcovering) ***with*** [Kassalen's Expert Report at Exhibit 34]

---

[37] Based on our review of Kassalen's expert report, we believe he meant to say $933,220.71, or roughly $933,000. Kassalen's Expert Report at 14 ("I conclude that Longwood suffered a loss of $933,220.71 … as a result of the work performed by Hunley.").

> (requiring Sodexo to pay damages for "$86,597.00" owed to Tigano Painting and Wallcovering).
>
> This comparison also explained why the total amount awarded a second time by indemnification ($419,548.97) is very slightly lower than the "amount[] unpaid to subcontractors" in the damages award ($443,623.60). The former only includes amounts owed to those subcontractors that ***elected to sue Longwood***. In contrast, the damages award includes amounts owed to ***all*** subcontractors: the entire indemnity award ***plus*** amounts unpaid to subcontractors that elected ***not*** to sue (likely because they did not have as much to collect). ***See*** [Kassalen's Expert Report at Exhibit 34] (listing invoices from subcontractors that were not parties below).

Sodexo's Brief at 20-21 (emphasis in original; some citations omitted).

In response, Longwood counters that allowing it to recover its principal damages and be indemnified for the Subcontractors' award does not result in a double recovery. It insists that "[t]his is not a double recovery because the acts of Sodexo and its co-conspirators are the but-for cause of Longwood['s] incurring the debt to the Subcontractors in the first place." Longwood's Brief II at 36.

We wholly reject Longwood's argument. The trial court's indemnification award results in a double recovery for Longwood. Such a result is unfair and inequitable, and the trial court abused its discretion in ordering common-law indemnification as an equitable remedy on this basis, too.

Therefore, for the foregoing reasons, we reverse the part of the trial court's May 11, 2021 judgment at GD 18-012048, requiring Sodexo to, jointly and severally, indemnify Longwood for all sums paid by Longwood to the Subcontractors, or any of them, and all sums collected from Longwood by the Subcontractors, or any of them. This award was improper.

**Sodexo's Second Issue**

In Sodexo's second issue, it argues that the trial court erred in awarding attorneys' fees and litigation expenses to Longwood under the Longwood Management Agreement. Here, the relevant provision of the Longwood Management Agreement sets forth that:

> In the event that any action or proceeding is brought to enforce any term, covenant, or condition of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, court costs, and related expenses.

Longwood Management Agreement at 9.

In awarding attorneys' fees to Longwood in this litigation, and not Sodexo, the trial court opined:

> Both the Longwood Management Agreement and the PSC Management Agreement contained a clause that provided that, in an action to enforce a term or condition of the agreement, the "prevailing party" shall be entitled to attorneys' fees, costs, and expenses. Interpreting a contract is a question of law. ***Profit Wize Marketing v. Wiest***, 812 A.2d 1270, 1275 (Pa. Super. 2002). Because both agreements do not define the term "prevailing party," this [c]ourt must look to the plain and ordinary meaning of the term "prevail" in order to discern the contractual intent of the parties. ***Id.*** "In common parlance, to prevail means to gain ascendency through strength or superiority: TRIUMPH." ***Id.*** [(]citing *Merriam Webster's Collegiate Dictionary*, 7th [e]d. at 924[)]. *Black's Law Dictionary* further defines the term prevail to mean "to obtain the relief sought in an action; to win a lawsuit." ***Id.*** [(]citing *Black's Law Dictionary*, 7th [e]d. at 1206[)].
>
> In this case, Longwood brought duplicative claims under both the Longwood Management Agreement and the PSC Management Agreement in order to cover its bases. Although this [c]ourt determined that Longwood only incurred damages in relation to the Longwood Management Agreement, and that Sodexo was entitled to damages with regard to its counterclaims for software license fees, Sodexo is not necessarily the "prevailing party." With regard to Sodexo's counterclaims for software license fees, this

> [c]ourt declared that Sodexo was entitled to $4,409.65 from Longwood and $31,666.47 from PSC. In contrast, with regard to Longwood's claims for breach of contract and fraud, this [c]ourt held that Sodexo was liable to Longwood for damages in excess of $900,000.00. Additionally, this [c]ourt determined that Sodexo must indemnify Longwood for any payments Longwood makes to the Subcontractors, and those payments are in excess of another $400,000.00.[38] Given that the common definition of the term prevail is to gain ascendency through strength or superiority, or to triumph, this [c]ourt determined that Longwood and not Sodexo was actually the "prevailing party" in this litigation....

TCO II at 40-41. Accordingly, the trial court awarded Longwood $1,062,053.67 in attorneys' fees and litigation expenses, and awarded Sodexo no attorneys' fees or litigation expenses.

It is well-established that "[t]he general rule within this Commonwealth is that each side is responsible for the payment of its own costs and counsel fees absent bad faith or vexatious conduct." *McMullen v. Kutz*, 985 A.2d 769, 775 (Pa. 2009) (citation omitted). "This so-called 'American Rule' holds true unless there is express statutory authorization, a clear agreement of the parties or some other established exception." *Id.* (citation and some internal quotation marks omitted). It has been recognized that "a primary purpose of contractual fee-shifting clauses is to discourage litigation by creating an incentive for the parties to satisfy their contractual obligations and to think twice before filing long-shot claims or contesting valid claims." *See* Kevin P. Allen, *CONTRACTUAL FEE-SHIFTING CLAUSES — HOW TO DETERMINE*

---

[38] As set forth *supra*, we have reversed this common-law indemnification award.

*"PREVAILING PARTY" STATUS*, 74 Pa.B.A.Q. 178, 179-80 (Oct. 2003) (footnote omitted).

As the trial court observed, "the interpretation of a contract is a question of law[,]" and "our standard of review is plenary." **Profit Wize**, 812 A.2d at 1274 (citations omitted). Further,

> [w]hen interpreting the language of a contract, the intention of the parties is a paramount consideration. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.
>
> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.
>
> On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

*Id.* at 1274-75 (cleaned up).

Here, Sodexo contests the trial court's award, arguing that "[n]o party was 'the prevailing party' in this litigation[,]" as "[t]he verdict here was mixed — both Longwood and Sodexo received judgments in their favor." Sodexo's

Brief at 22, 23 (emphasis omitted). Sodexo points out that, while Longwood was successful on some of its affirmative claims, Sodexo prevailed on some of its counterclaims as well as all of PSC's claims, and successfully defended against Longwood's claims for contractual indemnification and punitive damages. *Id.* at 24-25. Sodexo says that, generally, under the American Rule, each side is responsible for paying its own attorneys' fees and costs. *Id.* at 23. In order to obtain fees, Sodexo asserts that "Longwood had to show that the parties had reached a 'clear agreement' to set aside the American Rule and award them 'in the present situation[,]'" and that, in the Longwood Management Agreement, "[t]he term 'the prevailing party' refers clearly to a circumstance where only one party has won a judgment." *Id.* at 22, 24 (citing *Trizechahn Gateway, LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009) (framing issue as whether there was a clear agreement of the parties to award fees in the present situation)). Quoting *Profit Wize*, Sodexo advances that "'prevailing party' is '[c]ommonly defined as a party in whose favor a judgment is rendered, regardless of the amount of damages awarded.'" *Id.* at 24 (quoting *Profit Wize*, 812 A.2d at 1275)).[39] It also states that, "importantly, the phrase here is '*the* prevailing party.' That term is singular, meaning this provision contemplates *one* prevailing party." *Id.* (citation omitted; emphasis in original). As such, Sodexo claims that "this provision does not apply when

---

[39] The trial court only provided *Profit Wize's* definition of 'prevail' in its above-stated analysis. It failed to mention that the *Profit Wize* Court specifically set forth a definition for 'prevailing party' in its opinion.

multiple parties received judgments in their favor, and it should not have been applied here. Both Longwood and Sodexo won judgments." *Id.* According to Sodexo, "[n]either was 'the prevailing party' within the meaning of the contract, and the [t]rial [c]ourt should simply have applied the default American Rule." *Id.* at 25.

In Sodexo's argument, it underscores that it prevailed on some of its counterclaims relating to software licensing fees and all of PSC's claims against it, and successfully defended against Longwood's claims for contractual indemnification and punitive damages. However, Sodexo fails to convince us that any of these victories should prevent Longwood from receiving attorneys' fees under the contract.

First, with respect to Sodexo's counterclaims pertaining to software licensing fees, Sodexo fails to explain why its counterclaims should not be treated as a separate, independent 'action or proceeding' from Longwood's 'action or proceeding.' *See* Longwood Management Agreement at 9 ("***In the event that any action or proceeding is brought to enforce any term, covenant, or condition of this Agreement***, the prevailing party shall be entitled to recover reasonable attorneys' fees, court costs, and related expenses.") (emphasis added). Though filed at the same docket number, Sodexo's counterclaims do not appear to relate to Longwood's action in any way. Furthermore, our High Court has characterized counterclaims as independent actions. ***See Topelski v. Universal South Side Autos, Inc.***, 180 A.2d 414, 421 (Pa. 1962) ("A counterclaim is in effect a declaration by

defendant against plaintiff in the nature of an ***independent action*** deferred until the defendant is brought into court.") (citation and internal quotation marks omitted; emphasis in original); ***see also Kaiser by Taylor v. Monitrend Inv. Management, Inc.***, 672 A.2d 359, 362 (Pa. Cmwlth. 1996) ("A counterclaim is an independent action brought by the defendant in opposition to a plaintiff's claim. It is wholly independent of the transaction upon which the plaintiff's cause of action is based, and it represents the right of the defendant to obtain affirmative relief from the plaintiff.") (citations omitted).

Problematically, Sodexo's argument focuses solely on the term 'the prevailing party' in the latter part of the Longwood Management Agreement's attorney-fee provision, and ignores the earlier language contained in the provision. Sodexo does not advance any argument on how we are to interpret the terms 'action' or 'proceeding,' nor does it address whether counterclaims constitute a separate, independent 'action' or 'proceeding' under the agreement.[40] We decline to develop this argument for it. ***Commonwealth***

---

[40] The Longwood Management Agreement does not define 'action' or 'proceeding.' Examining their natural, plain, and ordinary meanings, an 'action' is commonly defined as "a civil or criminal judicial proceeding[,]" *Black's Law Dictionary* (11th ed. 2019), or "the initiating of a proceeding in a court of justice by which one demands or enforces one's right[.]" ***See*** Action, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/action (last visited Mar. 2, 2023). 'Proceeding' is commonly defined as "legal action[,]" ***see*** Proceeding, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/proceeding (last visited Mar. 2, 2023), or

*(Footnote Continued Next Page)*

*v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. … This Court will not act as counsel and will not develop arguments on behalf of an appellant.") (citations omitted). As such, we are unpersuaded that Sodexo's prevailing on its software licensing counterclaims prohibits Longwood from receiving attorneys' fees for the action it brought to enforce the Longwood Management Agreement, on which Longwood prevailed.

Second, the fact that Sodexo purportedly prevailed on all of PSC's claims against it also does not warrant reversing the trial court's fee award. To begin, PSC's claims would seemingly implicate the attorney-fee provision under the PSC Management Agreement, not the Longwood Management Agreement. Setting that aside, though, the trial court recognized that "Longwood brought *duplicative* claims under both the Longwood Management Agreement and the PSC Management Agreement in order to cover its bases." TCO II at 40 (emphasis added). *See also* TCMNV at 1-2 (explaining that McCollum "was an employee of Sodexo during all times material to this litigation and was

---

1. The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. 2. Any procedural means for seeking redress from a tribunal or agency. 3. An act or step that is part of a larger action. 4. The business conducted by a court or other official body; hearing.

*Black's Law Dictionary* (11th ed. 2019).

assigned by Sodexo to perform its obligations at *both* PSC and Longwood")

(emphasis added).  Longwood elaborates,

> both PSC and Longwood had facilities management agreements with Sodexo.  Longwood and PSC are affiliated entities that share a number of resources, including executive staff.  Because of the incompetent manner in which Sodexo serviced those contracts, … McCollum … came to be Sodexo's on-site manager at both campuses.  In other words, McCollum was Sodexo's on-site representative for both the Longwood Management Agreement and the PSC Management Agreement.  This was despite the fact that each contract required Sodexo to provide a dedicated manager to each campus.
>
> Sodexo's conflation of these two agreements and its incompetent performance forced PSC and Longwood to each bring their own claims for fraud and breach of contract; that is, to plead that either Longwood or PSC, but not both, were entitled to damages for fraud and breach of contract.  Ostensibly, had only one entity filed suit, Sodexo would have argued that such party lacked standing.  Had only PSC sued Sodexo, Sodexo would have argued that it was Longwood that had sustained the complained-of damages arising out of the Longwood Management Agreement.  Conversely, had only Longwood sued Sodexo, Sodexo would have argued that McCollum was furnished under the PSC Management Agreement and kept his office at the PSC campus, and therefore PSC was the proper plaintiff.  As such, in choosing the proper entity to bring its claims[,] Longwood and PSC were stuck in the proverbial "catch-22."  The only way they could "cover their bases," as the [t]rial [c]ourt explained, was to bring duplicative claims on behalf of both entities.  This is exactly what Longwood and PSC did.

Longwood's Brief II at 63-64 (footnote and internal citations omitted).

Because Sodexo assigned McCollum to perform its obligations at both

Longwood and PSC, and given the understandable confusion as to which entity

was the proper plaintiff, we do not view Sodexo's purported success on PSC's

claims as defeating Longwood's entitlement to attorneys' fees under the

Longwood Management Agreement.

Finally, Sodexo contends that it prevailed on Longwood's claims for contractual indemnification and punitive damages, such that Longwood should not be considered the prevailing party. We disagree. As the ***Profit Wize*** Court observed,

> "prevailing party," is commonly defined as "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded." While this definition encompasses those situations where a party receives less relief than was sought or even nominal relief, its application is still limited to those circumstances where the fact finder declares a winner and the court enters judgment in that party's favor.

***Profit Wize***, 812 A.2d at 1275-76 (internal citations omitted).

Here, while Longwood did not receive contractual indemnification or punitive damages, the trial court nevertheless directed the Department of Court Records to enter judgment on Longwood's action to enforce the Longwood Management Agreement "in favor of Longwood and against all Defendants, jointly and severally, in the amount of $933,220.71." ***See*** Trial Court Judgment at GD 15-015968, 5/11/21, at 2. Pursuant to ***Profit Wize***, the fact that Longwood received less relief than it initially sought does not bar it from being the prevailing party. Moreover, with respect to Longwood's action, the trial court declared a winner and entered judgment in Longwood's favor.

Based on the foregoing, we deem meritless Sodexo's argument that Longwood should not receive attorneys' fees because both Longwood and Sodexo were prevailing parties in Longwood's action to enforce the Longwood

Management Agreement.[41]  Accordingly, we affirm the part of the May 11, 2021 judgment entered at GD 15-015968 that awards $1,062,053.67 in attorneys' fees and litigation expenses to Longwood.

To review, regarding Sodexo's appeals at 676 WDA 2021 and 677 WDA 2021, we reverse the trial court's May 11, 2021 judgment at GD 18-012048, to the extent it required Sodexo to, jointly and severally, indemnify Longwood for all sums paid by Longwood to the Subcontractors, or any of them, and all sums collected from Longwood by the Subcontractors, or any of them.  In addition, we affirm the May 11, 2021 judgment entered at GD 15-015968, insofar as it awards $1,062,053.67 in attorneys' fees and litigation expenses to Longwood.

### Hunley's Appeal at 670 WDA 2021

Next, we address Hunley's appeal at 670 WDA 2021.  In its appeal, Hunley raises three issues for our review:

> 1. Do the record facts and law support the trial court's finding that [Hunley] must indemnify Longwood in the amount Longwood owes [the] Subcontractors for work Longwood received from those Subcontractors?

---

[41] Though Sodexo alleges various errors in the trial court's calculation of Longwood's attorneys' fees, we do not address those claims further, as Sodexo did not specifically raise that issue in its Statement of the Questions Involved. **See** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). Similarly, we do not address whether Sodexo should receive attorneys' fees for its successful counterclaims, as Sodexo did not seek to recover attorneys' fees on appeal, but instead argued that neither Sodexo nor Longwood should receive them.  **Id.**

2. Did the trial court err both factually and legally by denying [Hunley's] crossclaim, thus failing to find that Longwood must contribute or indemnify [Hunley] for amounts [Hunley] may owe [the] Subcontractors?

3. Did Longwood waive any claim for indemnity on its crossclaim and likewise waive any purported defense to [Hunley's] crossclaims?

Hunley's Brief at 7.[42]

**Hunley's First Issue**

In Hunley's first issue, it challenges the trial court's determination that "Hunley, McCollum, Aufman, Sepcic, and Sodexo shall, jointly and severally, indemnify Longwood for all sums paid by Longwood to [the Subcontractors], or any of them, and all sums collected from Longwood by [the Subcontractors], or any of them[.]" *See* Trial Court Judgment at GD 18-012048, 5/11/21, at 2-3. Hunley argues that "[t]he record does not support

_____

[42] Longwood urges us to quash Hunley's appeal because of the vagueness and breadth of Hunley's claims, and its disregard for our Rules of Appellate Procedure. *See* Longwood's Brief at 670 WDA 2021 ("Longwood's Brief III") at 27-34. While we reprimand Hunley for its lack of specificity and non-compliance with our Rules of Appellate Procedure — particularly with respect to its incomplete reproduced record that primarily contains only its own trial exhibits — we decline to quash its appeal, as we can adequately identify the issues raised by Hunley. *See Grimm v. Universal Medical Services, Inc.*, 156 A.3d 1282, 1284 n.2 (Pa. Super. 2017) (declining to quash appeal because the appellants' "failure to file a reproduced record does not 'preclude our ability to properly evaluate and address the substantive arguments advanced by the parties'") (citation omitted); *Kern v. Kern*, 892 A.2d 1, 6 (Pa. Super. 2005) ("[A]s a practical matter, this Court quashes appeals for failure to conform to the Rules of Appellate Procedure only where the failure to conform to the Rules results in the inability of this Court to discern the issues argued on appeal. [The a]ppellants' failure to conform to the Rules of Appellate procedure regarding [their] brief cannot be condoned, but [the a]ppellants' failure has not hampered our review.") (citation omitted).

any finding that there was fraud or conspiracy by [Hunley] such that [Hunley] should have to indemnify Longwood for the amounts Longwood rightly owes [the] Subcontractors." Hunley's Brief at 22. In addition, Hunley asserts that "indemnification does not lie where Longwood has its own breach-of-contract liability to [the] Subcontractors." *Id.*

Initially, this Court has already affirmed the trial court's May 11, 2021 judgment at GD 15-015968, to the extent that it found Hunley liable for fraud and conspiracy. *See Zadok Grahm Hunly Corp. v. Presbyterian SeniorCare*, 2023 WL 2232655 (Pa. Super. Feb. 27, 2023) (unpublished memorandum). Therefore, we reject Hunley's argument that "[b]ecause the record does not show Longwood was defrauded by [Hunley] and likewise does not show that [Hunley] engaged in some conspiracy to commit fraud, Longwood had no record basis to claim that [Hunley] should indemnify Longwood." Hunley's Brief at 30.

However, we deem meritorious Hunley's other argument that common-law indemnification is inappropriate here because Longwood has its own breach-of-contract liability to the Subcontractors. As we discussed in Sodexo's First Issue *supra*, Longwood's liability to the Subcontractors stemmed from a contract of guaranty and not from some responsibility it had under the law to the Subcontractors for their tort damages despite being itself blameless. *See also* Hunley's Brief at 30. As such, common-law indemnification is inappropriate under the circumstances. We also reiterate that Longwood's indemnification award results in Longwood's receiving a

double recovery, which is unfair and inequitable. ***See*** Sodexo's First Issue, ***supra***.

For these reasons, we reverse the part of the trial court's May 11, 2021 judgment at GD 18-012048, requiring Hunley to, jointly and severally, indemnify Longwood for all sums paid by Longwood to the Subcontractors, or any of them, and all sums collected from Longwood by the Subcontractors, or any of them. Because we reverse indemnification as to Hunley, we also reverse the part of the trial court's judgment at GD 18-012048, requiring McCollum, Aufman, and Sepcic to indemnify Longwood, as indemnification was imposed on them by virtue of piercing Hunley's corporate veil. ***See*** TCMNV at 25 ("The true culprits are Hunley represented by Aufman, Sepcic, and McCollum who conducted the fraudulent scheme and extracted the funds from Hunley, causing it to default on its debt to the Subcontractors. This Court has already pierced Hunley's … corporate veil, therefore Aufman, Sepcic, and McCollum are also personally liable under the crossclaim."); ***id.*** at 23 ("McCollum, Aufman, and Sepcic are personally liable for Hunley's debts."); Trial Court Opinion ("TCO III"), 4/18/22, at 23 ("[T]his [c]ourt properly pierced the corporate veil and correspondingly determined that McCollum, Aufman, and Sepcic are personally liable for Hunl[e]y's debts."); ***see also Wicks v. Milzoco Builders, Inc.***, 470 A.2d 86, 89-90 (Pa. 1983) ("Where the court pierces the corporate veil, the owner is liable because the corporation is not a *bona fide* independent entity; therefore, its acts are truly his.") (footnote omitted).

**Hunley's Second Issue**

In Hunley's second issue, it argues that the trial court erred "both factually and legally by denying [Hunley's] crossclaim, thus failing to find that Longwood must contribute or indemnify [Hunley] for amounts [Hunley] may owe [the] Subcontractors." Hunley's Brief at 31. It avers that "[t]he amounts owed to [the] Subcontractors, including any amounts which [Hunley] might owe, are a combination of Longwood's own direct contracts with [the] Subcontractors and amounts Longwood contractually agreed to pay [Hunley] with the understanding that [Hunley] would pay [the] Subcontractors." *Id.* Furthermore, Hunley says that, even if such contracts did not exist, Longwood has been unjustly enriched by Hunley's work, such that indemnification is warranted. *Id.* at 32.

No relief is due. With respect to Hunley's argument that Longwood had direct contracts with the Subcontractors, the trial court found that: (1) the Subcontractors' unpaid invoices accrued before Hunley was terminated; (2) not one of those invoices were directed at Longwood; (3) each of the Subcontractors testified that all of their work relative to this litigation was done as a subcontractor for Hunley; (4) Aufman's testimony, and Hunley's bookkeeping, are not credible; and (5) Longwood's role regarding the unpaid invoices was only in the form of a verbal contract of guaranty. *See* TCMNV at 24. The record supports these findings, and we decline to disturb them. *Woullard*, *supra* ("Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record

and whether the trial court erred in applying the law.") (citations omitted); *see also* N.T. Trial, 3/11/19, at 1364 (Bulger's confirming that the unpaid Subcontractors' invoices related to projects that were undertaken at Hunley's direction, and that he did not ever personally direct the Subcontractors to perform work and then bill the work to Hunley); N.T., 3/13/19, at 1760 (Bierly's stating that all of Riverview Carpet and Flooring, Inc.'s unpaid invoices are directed at Hunley); *id.* at 1761 (Bierly's testifying that Riverview Carpet and Flooring, Inc., was the subcontractor of Hunley on all of the at-issue jobs); *id.* at 1778 (Mascaro's testifying that all of the unpaid invoices from Masco Interiors, Inc., in this litigation were directed to Hunley); *id.* at 1780 (Mascaro's stating that he considered Masco Interiors, Inc., to be a subcontractor of Hunley in this matter); *id.* at 1784 (Tigano relaying that all of Tigano Painting and Wallcovering's unpaid invoices were directed to Hunley); *id.* at 1788 (Pastucha's stating that all of the unpaid invoices from his business were directed to Hunley).

Further, Hunley's claim that Longwood failed to pay Hunley in accordance with their contractual agreements also lacks merit. This Court has already affirmed the trial court's determination that Longwood did not breach its contracts with Hunley. *See Zadok Grahm Hunly Corp.*, 2023 WL 2232655, at *19. There, we explained:

> [T]his Court has recognized that "[t]he general rule, of course, is
> that fraud in the inducement renders a contract voidable at the
> option of the defrauded party." *Stringert & Bowers, Inc.*, 345
> A.2d [194, 196 (Pa. Super. 2005)] (citations omitted). *See also*
> *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874

> A.2d 1179, 1184 (Pa. Super. 2005) ("Our Supreme Court and this Court have consistently held that the victim of fraud in the inducement has two options: (1) rescind the contract, or (2) affirm the contract and sue for damages.") (citations omitted)). We have already upheld the trial court's determination that Hunl[e]y committed fraud. Thus, we agree with the trial court that Longwood could void its agreements with Hunl[e]y, and therefore, did not breach any contract.[18]
>
>> [18] Even if there was an enforceable contract, Longwood rightly points out that "Hunl[e]y did not perform any actual 'general contracting services' — it just used McCollum[, a Sodexo employee,] to distribute work to subcontractors and then sent Longwood over-inflated invoices. Hunl[e]y did no work and as such could not have triggered any real or imagined contractual obligation for Longwood to pay money."

*Id.* (citation and original brackets omitted).

Finally, to the extent Hunley advances that Longwood was unjustly enriched by Hunley's work, and therefore Longwood should have to indemnify Hunley, no relief is due on this basis either. "Unjust enrichment is an equitable remedy, defined as 'the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution.'" ***Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC***, 194 A.3d 1010, 1034 (Pa. 2018) (citation omitted). Here, Hunley did not confer any benefit upon Longwood, as it performed no actual work. In addition, we agree with the trial court's observation that Hunley's own actions bar it from receiving equitable relief:

> Hunley's unjust enrichment claims are dismissed because Hunley comes with unclean hands. A court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to

the matter at issue. *In re Estate of Aiello*, 993 A.2d 283, 288 (Pa. Super. … 2010). This [c]ourt finds that Hunley's fraud precludes equitable relief.

TCMNV at 27.

As we reject Hunley's theories that the money Hunley owes to the Subcontractors is due to Longwood's contractual breaches, and/or that Longwood has been unjustly enriched by Hunley's work, we conclude that the trial court did not err in denying Hunley's crossclaim for indemnification. Accordingly, we affirm this aspect of the trial court's May 11, 2021 judgment entered at GD 18-012048.

### Hunley's Third Issue

In Hunley's third issue, it contends that Longwood waived any purported defense to Hunley's crossclaim.[43] Hunley insists that, "[b]eginning no later than October 2014 and continuing thereafter, Longwood came to possess information that McCollum and [Hunley] had a preexisting association." Hunley's Brief at 34.[44] According to Hunley, "[w]hile having such information and while also having come to believe that [Hunley's] profits were too high, Longwood scrutinized certain invoices in 2015 and decided to accept and pay those invoices regardless of its belief about [Hunley's] profits and the

---

[43] Hunley likewise argues that Longwood waived its claim for indemnity against Hunley. However, we have already discerned that Hunley does not have to indemnify Longwood, so we need not address this aspect of Hunley's argument further. *See* Hunley's First Issue, *supra*.

[44] As mentioned earlier, in October of 2014, Longwood received an anonymous letter that accused McCollum of having an improper interest in Hunley. TCO I at 4.

preexisting associations of Aufman, Sepcic, McCollum, and [Hunley]." *Id.* It argues that "Longwood's actions of continuing to use [Hunley's] services and continuing to pay [Hunley] after knowing of the parties' associations and after believing [Hunley] was overcharging are inconsistent with Longwood's later affirmative and defensive assertions that the [Hunley]-Longwood contracts and [Hunley] invoices were invalid because of fraud, conspiracy, or any other wrong." *Id.* at 35. It says that, "[i]f Longwood believed it had an excuse or right … that entitled Longwood to defend against [Hunley's] claims for contribution or indemnification by Longwood, Longwood waived any such excuse or right because Longwood itself continued the contracts after knowing of the purported excuse/right to do otherwise." *Id.* at 35-36.

No relief is warranted. We have already rejected this waiver argument. *See Zadok Grahm Hunly Corp.*, 2023 WL 2232655, at *13-*14. In our previous memorandum, we opined:

> A waiver in law is the act of intentionally relinquishing or abandoning some known right, claim or privilege. To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it[.] Waiver is essentially a matter of intention. It may be expressed or implied. In the absence of an express agreement[,] a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. In short, the doctrine of implied waiver in Pennsylvania applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show that he was misled and prejudiced thereby[.]

***Brown v. City of Pittsburgh***, 186 A.2d 399, 401 (Pa. 1962) (cleaned up; footnotes omitted).

In response to Hunl[e]y's waiver argument, Longwood persuasively counters:

> The trial court correctly found that the anonymous letter was not sufficient to put Longwood on notice of the fraud that was taking place at the hands of Hunl[e]y and its co-conspirators. Without such knowledge, there can be no waiver. Longwood did not even know it was being defrauded, so it could not possibly have waived any rights, claims, or defenses with respect thereto.

> The reason why Longwood continued to use Hunl[e]y after receipt of the anonymous letter was because it had investigated the allegations in the letter at the time and determined them (albeit erroneously) to be unfounded. Only after years of litigation and extensive forensic investigation did Longwood become aware of the nature and extent of the fraudulent conspiracy that had victimized it. Again, the trial court agreed that Longwood went above and beyond what the law required in order to continue justifiably relying on Hunl[e]y, Aufman, Sepcic, and McCollum's misrepresentations.

> Similarly, the reason why Longwood continued to pay Hunl[e]y … was because Longwood reasonably believed at the time (again, erroneously) that it had a contractual obligation to do so. At the time, while Longwood may have been "suspicious" that Hunl[e]y was overcharging it, the scope and scale of Hunl[e]y's fraud remained concealed. … Bulger, who had replaced McCollum as the head of the unit turnovers at Longwood, was new to the job and faced with angry, unpaid Subcontractors threatening work stoppages, Aufman's threats of litigation and continued withholding of support for Hunley's over-inflated invoices, and residents ready to move into incomplete units. Under those circumstances, Bulger and Longwood rightly believed that they had no choice but to pay Hunl[e]y. When they did, Hunl[e]y persisted in its failure to pay the Subcontractors.

> Under these circumstances, no waiver of any kind can be imputed to Longwood.

Longwood's Brief at 672 WDA 2021 at 50-52 (internal citations omitted).

As Longwood aptly points out, because it did not have full knowledge of Hunl[e]y's fraud at the time it received the anonymous letter and when it made payments to Hunl[e]y in June and July of 2015, it could not act to intentionally relinquish or abandon its claims against Hunl[e]y. Put simply, Longwood did not realize at the time the existence and extent of Hunl[e]y's fraud, such that it could have knowingly waived its claims against Hunl[e]y. *See* N.T. Trial, 3/11/19, at 1371-73 ( … Bulger's testifying that, as of June 18, 2015, he knew Hunl[e]y overcharged on some things, but did not know the size and scope of the overcharges); *see also id.* at 1402-03 (similar); N.T. Trial, 3/6/19, at 670 (PSC's Chief Financial Officer's testifying that, in May of 2015, Longwood did not know what Hunl[e]y's overcharge was, but that … Bulger surmised that "there [were] costs exceeding what he would normally receive for the scope of work being completed"). Further, with respect to the June and July of 2015 payments, there was testimony at trial that Longwood made these payments to Hunl[e]y so that Hunl[e]y would pay the Subcontractors. *See* N.T. Trial, 3/6/19, at 663-65, 671; N.T. Trial, 3/11/19, at 1351, 1373-74, 1394-95. Thus, even if Longwood fully knew of its claims against Hunl[e]y at that point (which it did not), we do not view Longwood's paying Hunl[e]y so that Hunl[e]y could pay the Subcontractors as a 'clear, unequivocal and decisive act' that Longwood wished to surrender its rights. Finally, we are unconvinced that Hunl[e]y was misled by any of Longwood's actions to its prejudice. Therefore, this claim likewise lacks merit.

*Id.* (some citations and original brackets omitted). As such, there is no reason to disturb the trial court's May 11, 2021 judgment entered at GD 18-012048 on this basis.

In sum, with respect to Hunley's appeal at 670 WDA 2021, we reverse the trial court's May 11, 2021 judgment entered at GD 18-012048, to the extent it required Hunley, McCollum, Sepcic, and Aufman to, jointly and severally, indemnify Longwood for all sums paid by Longwood to the

Subcontractors, or any of them, and all sums collected from Longwood by the Subcontractors, or any of them. We affirm the judgment in all other respects as to Hunley.

### **Aufman's Appeal at 674 WDA 2021**

Finally, we reach Aufman's appeal at 674 WDA 2021. In his appeal, Aufman raises the following questions for our consideration:

> 1. Do the record facts and law support the trial court's decision to disregard [Hunley's] corporate form and to impose direct and/or indemnification liability on … Aufman?
>
> 2. Do the record facts and law support the trial court's decision to impose direct and/or indemnification liability on Aufman on any grounds aside from disregarding [Hunley's] corporate form?
>
> 3. Did Longwood waive its crossclaim against Aufman?

Aufman's Brief at 7.[45]

### **Aufman's First Issue**

In Aufman's first issue, he claims that the record facts and law do not support the trial court's decision to disregard Hunley's corporate form, and to impose direct liability on Aufman for breach of contract. Aufman's Brief at 20; *see also* Trial Court Judgment at GD 18-012048, 5/11/21 (finding Aufman

---

[45] Longwood similarly asks us to quash Aufman's appeal for vagueness, insufficient specificity, and failure to follow our Rules of Appellate Procedure. Because we are able to discern Aufman's issues, we again decline to do so, but nevertheless admonish him for his lack of compliance, particularly with respect to his inadequate reproduced record.

liable for breach of contract to the Subcontractors).[46]  We disagree.  As this
Court recognized in our previous writing related to this matter:

> There is a strong presumption in Pennsylvania against piercing the corporate veil.  Any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.
>
>> Piercing the corporate veil is … a matter of equity, allowing a court to disregard the corporate form and assess one corporation's liability against another.  The corporate veil will be pierced and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime.
>
> The corporate form thus may be disregarded where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.
>
> In **Ashley v. Ashley**, 393 A.2d 637, 641 (Pa. 1978), we held that the corporate form may be disregarded "whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests."  And in **Lumax Indus., Inc. v. Aultman**, 669 A.2d 893, 895 (Pa. 1995), we cited favorably the Commonwealth Court's enumeration of factors relevant to the piercing inquiry: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetrate a fraud."
>
> **Mortimer v. McCool**, 255 A.3d 261, 268 (Pa. 2021) (footnotes, brackets, and most quotation marks omitted).

---

[46] Aufman also challenges the trial court's decision to disregard Hunley's corporate form and impose indemnification liability on him.  However, because we have already reversed the trial court's judgment requiring Aufman to indemnify Longwood, we need not address this part of Aufman's argument. **See** Hunley's First Issue, **supra**.

In the case *sub judice*, the trial court discerned that piercing the corporate veil of Hunl[e]y was warranted, relaying:

This court finds that justice and public policy demand piercing Hunl[e]y's veil. The circumstances of this case show that neither innocent parties will be prejudiced nor is the theory of corporate entity undermined. Further, the factors of this case are sufficient to defeat the presumption against veil piercing.

Hunl[e]y was formed solely as part of the fraudulent scheme for McCollum to extract money from Longwood. Hunl[e]y was hired as a general contractor while McCollum, who was already receiving payment from Sodexo for his services to Longwood, performed all the tasks associated with that role. Hunl[e]y did no actual work whatsoever. Further, Hunl[e]y was mainly financed through a loan from … McCollum's company, W.F. Cody Corp. Longwood was Hunl[e]y's sole client and source of revenue. Most of that revenue funneled back to … McCollum. Now Hunl[e]y is insolvent and has no way of paying its creditors or satisfying any judgment against it. It is clear that Aufman and Sepcic never had an intent to use Hunl[e]y for a legitimate business end. Hunl[e]y began operating before it was even incorporated. Further, there was substantial intermingling of corporate and personal affairs. The company was operated out of Aufman's accounting office and shared staff with Aufman's other business enterprises. Those staff members were not compensated by Hunl[e]y, but instead by Aufman's accounting firm. Hunl[e]y never had actual employees other than … McCollum's son, an unpaid intern that wrote checks to his own company in the amount of $975,000.00.

It is inequitable and unjust for McCollum, Aufman, and Sepcic to make use of the corporate form to escape their liability for their participation in fraud. This court finds that piercing Hunl[e]y's veil would not undermine the theory of the corporate form. To the contrary, this court can find no legitimate business end that would justify preserving Hunl[e]y's corporate form. No innocent parties will be harmed by piercing Hunl[e]y's veil, but the inverse is true; innocent parties will be harmed if there was no way to recover damages from Aufman and Sepcic for their contribution to the fraudulent scheme. Therefore, this court finds that factors weighing in favor of piercing the corporate

> veil are sufficient to overcome the presumption against veil piercing.

TCMNV at 22-23 (internal citations omitted).

> We agree with the trial court's above-stated analysis. Aufman, Sepcic, and McCollum created and used Hunl[e]y to perpetrate a fraud. Given the circumstances of this case, justice demands piercing Hunl[e]y's veil.

***Zadok Grahm Hunly Corp.***, 2023 WL 2232655, at *16-*17 (original brackets omitted). Thus, Aufman's first issue is meritless.

### Aufman's Second Issue

In Aufman's second issue, Aufman confusingly claims that — on top of the fact that the trial court should not have disregarded Hunley's corporate form — the record facts and law do not support the trial court's decision to impose direct liability on Aufman for breach of contract. Aufman's Brief at 24.[47] He says that he "did not have a contract with [the] Subcontractors or Longwood[,]" and therefore, "could not have breached any such contract." ***Id.*** In addition, he argues that the Subcontractors withdrew their breach-of-contract claim against him and, as a result, any judgment holding him directly liable to the Subcontractors must be vacated for lack of jurisdiction. ***Id.*** at 25.

Initially, it does not matter that Aufman had no personal contracts with the Subcontractors. Hunley had contracts with the Subcontractors, and the

---

[47] Again, Aufman also challenges the trial court's decision to impose indemnification liability on him. However, we have already reversed that part of the trial court's judgment, and therefore, do not address indemnification further here. ***See*** Hunley's First Issue, ***supra***.

trial court properly pierced Hunley's corporate veil to hold Aufman personally liable for breaching them. *See* Aufman's First Issue, *supra*.

Further, we reject Aufman's assertion that the Subcontractors withdrew their breach-of-contract claims against him, such that the trial court did not have jurisdiction to enter judgment against him. Problematically, in the argument section of his brief, Aufman does not point us to where in the record this withdrawal purportedly took place. Notwithstanding, our own review of the record shows that the following occurred at trial:

> [Sodexo's attorney]: Your Honor, we have an administrative matter. This was discussed at the pretrial conference, but to be sure the record is clear, [the Subcontractors] are not suing a breach of contract claim [*sic*] against Sodexo. I wanted to make sure it is clear on the record.
>
> [Subcontractors' attorney]: Yes, we had no contract with Sodexo.
>
> [McCollum's attorney]: [They] also withdrew [their] claim against … McCollum individually by stipulation at a pretrial conference.
>
> [Subcontractors' attorney]: Yes.
>
> [Hunley's attorney]: I think you did so against Mr. Aufman as well?
>
> [Subcontractors' attorney]: Except for the breach of contract. You're right, but Hunley we didn't.
>
> [Hunley's attorney]: Hunley is in, but Mr. Aufman, you agreed to let him out?
>
> [Subcontractors' attorney]: Basically we are after Hunley and Longwood….
>
> [The court]: Got it.

N.T. Trial, 3/13/19, at 1747-48.

We do not read the foregoing as establishing that the Subcontractors relinquished all claims against Aufman. The Subcontractors' attorney did not

clearly confirm that the claims against Aufman were withdrawn, and their attorney emphasized repeatedly that the Subcontractors were pursuing breach-of-contract claims against Hunley. Ultimately, the trial court found that Hunley breached it contracts with the Subcontractors, and opined that "[t]he true culprits [in this matter] are Hunley represented by Aufman, Sepcic, and McCollum who conducted the fraudulent scheme and extracted the funds from Hunley, causing it to default on its debt to the Subcontractors." TCMNV at 25. As such, the trial court pierced Hunley's corporate veil, holding Aufman, Sepcic, and McCollum personally liable. *Id.* at 23 ("McCollum, Aufman, and Sepcic are personally liable to Hunley's debts."). Thus, Aufman's claim that the trial court should not have entered judgment against him for breach of contract fails; the Subcontractors pursued claims against Hunley, and the trial court appropriately ascertained that Hunley was created to perpetrate fraud and imposed personal liability on Aufman. As such, no relief is due on this issue.

### Aufman's Third Issue

In Aufman's third issue, he avers that Longwood waived its crossclaim against Aufman for the same reasons Hunley advanced above to support waiver. *See* Hunley's Third Issue, *supra*. However, we have already ruled that the trial court erred and/or abused its discretion in granting Longwood's crossclaim, and that Aufman does not have to indemnify Longwood. Moreover, even if we had not already made that determination, we would deem Aufman's argument unavailing for the same reasons we rejected

Hunley's waiver argument *supra*. **See id.** Thus, Aufman's third issue warrants no relief.

To summarize, we reiterate that we reverse the trial court's May 11, 2021 judgment entered at GD 18-012048, to the extent it ordered Aufman to indemnify Longwood. We affirm that judgment as to Aufman in all other respects.

## Conclusion

In conclusion, to give a final synopsis of our decision, we reverse the part of the May 11, 2021 judgment entered at GD 18-012048, requiring Hunley, McCollum, Aufman, Sepcic, and Sodexo to, jointly and severally, indemnify Longwood for all sums paid by Longwood to the Subcontractors, or any of them, and all sums collected from Longwood by Subcontractors, or any of them. In all other respects, we affirm the trial court's May 11, 2021 judgment entered at GD 18-012048. Regarding the trial court's May 11, 2021 judgment entered at GD 15-015968, we affirm the trial court's award of $1,062,053.61 in attorneys' fees and litigation expenses to Longwood.

Judgment entered at GD 18-012048 affirmed in part and reversed in part. Judgment entered at GD 15-015968 affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/10/2023</u>